BROWN TRANSPORT CORPORATION,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 20911.

United States Court of Appeals
Fifth Circuit.

July 9, 1964.

---

Fred W. Elarbee, Jr., Constangy &
Prowell, Atlanta, Ga., for petitioner.

Marcel Mallet-Prevost, Asst. Gen.
Counsel, N. L. R. B., Dominick L. Manoli,
Associate Gen. Counsel, N. L. R. B.,
Lawrence M. Joseph, Atty., N. L. R. B.,
Washingon, D. C., Arnold Ordman, Gen.

Counsel, Allison W. Brown, Jr., Atty., N. L. R. B., for respondent.

Before TUTTLE, Chief Judge, WISDOM, Circuit Judge, and McRAE, District Judge.

TUTTLE, Chief Judge.

This is a petition of Brown Transport Corporation to have this Court review and set aside an order issued by the National Labor Relations Board, which denied a requested injunction against alleged secondary picketing, charged to be in violation of Section 8(b) (4) (i) (ii) (B), of the National Labor Relations Act.[1]

The question here in simple terms is whether the conduct of the respondent below, The Truck Drivers & Helpers Union No. 728, International Brotherhood of Teamsters, during a strike against the petitioner, in following the trucks of petitioner to the premises of other parties to pick up or load freight and the picketing that took place at or near such neutral premises was done with the object of forcing or requiring the neutral parties to cease "using, selling, handling, transporting or otherwise dealing in the products of the petitioner," or to "cease doing business" with petitioner, or whether, as contended by the respondent, the conduct amounted to nothing more than an effort to bring home to the drivers of the trucks, wherever located, even at the premises of neutral parties, the message of the existence of the strike, and a request that the drivers conform to the union's policy of not working while the strike continued.

As is true in nearly all such cases as this, there was much conflict in the testimony of the witnesses as to many of the occurrences that took place during the ambulatory picketing. On the other hand, there are some undisputed facts. Since we are enjoined to overturn findings of fact by the Board only where they are not supported by substantial evidence on the record as a whole, we look first at the undisputed facts and the application of the principles of law by the Board to these.

The first basic fact, and on this the Examiner and the Board placed much weight in their respective decisions, is that the Local was fully cognizant of the limitations upon its activities in conducting ambulatory picketing. This knowledge was fully indicated by its preparing written instructions to the pickets to be carefully observed by them as they went about this picketing operation. These instructions directed that the pickets carry only the sign prepared especially for the purpose. This sign the Board found to read as follows:

"BROWN TRANSPORT CO., INC., UNFAIR TO MEMBERS OF TRUCK DRIVERS AND HELPERS LOCAL 728 ATLANTA-SAVANNAH; THIS PICKETING IS DIRECTED TO THE EMPLOYEES OF BROWN TRANSFER COMPANY AND TO NO ONE ELSE."

The pickets were instructed that they were not to induce employees of other carriers not to handle the freight of Brown. They were instructed when they

---

1. Section 8(b) (4), of the Labor Management Relations Act, as amended, makes it an unfair labor practice for a union or its agents:

"(i) to engage in, or to induce or encourage any individual employed by any persons engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * * Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing * * *" 29 U.S.C.A. § 158(b) (4) (A, B).

**32**

arrived at premises where a Brown truck was engaged in loading or unloading to hand a letter to the owner of the premises requesting that the picket be permitted to go upon the premises so that he could picket the driver of the Brown truck as close to the truck as possible. If permission was granted then a picket should picket as close to the truck and driver as was possible. However, in the event such permission was not granted, the picket was instructed to picket "just outside the property at the entrance closest to the place where the freight is being picked up and delivered. In that event, said entrance is the only place in which you will engage in picketing." [2] The pickets were instructed not to talk to anyone while picketing was being conducted. They were instructed not to wave the picket sign at any person, and to remain absolutely silent.

Other undisputed facts include the following: Picketing went on regularly at the primary situs of the Brown Transport Company's terminal in Atlanta. [3]

A normal day's operation by the pickets during the strike would be that a driver and a picket would follow each truck from the primary situs each morning when it went out to load or unload freight on the premises of a neutral third party. When the nonstriking driver of the Brown truck stopped to pick up freight the picket would get out of the automobile and carry his sign in the vicinity of the Brown truck unless it entered the premises as to which the picket was neither unable to obtain permission to enter or elected not to enter. [4] When the Brown truck entered such premises in these circumstances, the picket immediately took up his position at the entrance to the property and continued to walk and display his sign until he learned that the Brown truck had departed the premises. This occurred whether or not the Brown truck driver was within sight of the picket. It was

2. In light of standards contended by the Board to control, as set down in the Moore Dry Dock case, 92 NLRB 547, one of which criteria is "the picketing is to be limited to places reasonably close to the situs of the dispute," it is noted that the picket was instructed here to picket at the entrance regardless of whether the entrance was the closest place to the Brown truck, and regardless of whether the driver of the truck could see the picket at the entrance gate or not.

3. Neither the Examiner nor the Board majority made an analysis of the testimony dealing with the amount of time normally each day during which the drivers were exposed to the pickets at the primary location. However, in the dissenting opinion this analysis is made as follows: "To establish that such drivers spend substantial time at Brown's terminal, the General Counsel put on as witnesses seven Brown pickup and delivery drivers, at which point the Trial Examiner stated that the testimony on this point was cumulative. Concerning the time spent by them at the Brown terminal, as well as their estimate with respect to their opportunity to see the pickets here, the record shows:

Duffy: 2 or 2½ hours a day; observed picketing there 6 or 8 times a day;

Brown: 2 or 3 hours a day; observed picketing there 6, 8, or 10 times a day;

Duncan: 2 or 3 hours a day; observed picketing there about 6 times a day;

Hayes: 3 to 4 hours a day; pickets always there when he was;

Crews: 2 to 3 hours a day; no testimony on observing pickets;

Kitchen: Only a little time at terminal night and morning; no testimony on observing pickets;

Scott: (trailer driver who occasionally does pickup and delivery work) whose testimony concerns only his maximum of 10 round trips a day as trailer driver."

4. Although the testimony was not satisfactorily dealt with in the findings made by the Examiner here, it appears that with possibly a single exception the Examiner's finding that on each occasion the picket had sought permission from some person at the neutral premises, whether or not that person had authority to grant the request, was supported by the testimony of the picket in each instance. We assume the correctness of this finding, except as to the single incident mentioned.

clear that in some cases such, for instance, as when the Brown truck was in the large Candler Warehouse property covering an entire city block with many different loading docks and many intersecting passageways for trucks, the pickets continued to walk at the gate when the Brown truck was out of sight of the picket and his sign. Ordinarily the picket walked at the entrance which had been entered by the Brown truck, but on occasion the picket also walked at a secondary entrance, such as at Candler Warehouse, and on at least one occasion continued to picket after the truck had left the neutral premises because the truck, being out of sight of the picket, left without the knowledge of the picket.

It is undisputed that on a number of occasions the pickets deviated from their instructions and did talk in connection with the picketing.

In view of the fact that proof of eight instances of testimony about conduct of the pickets, which, if accepted as true by the Board, would tend to prove an illegal object of the picketing, were accepted as true both by the Examiner and by the Board, but were by both of them considered as *de minimis,* it becomes necessary for us to state this evidence with some particularity.

 The charging party first sought to prove the specific purpose or object of the ambulatory picketing to be that of appealing to neutral third parties who ceased their business relations with the petitioner by tendering the evidence of a union member, Smallwood, who later became a picket. Mr. Hemmings, the operations manager of petitioner, was on the witness stand and he was asked whether he had a conversation with

Smallwood prior to the strike. In response he stated that he had had such a conversation during negotiations and prior to the strike. Although petitioner stated its purpose to prove that Smallwood was a member of Local 728 and subsequently became one of the pickets, whose conduct was to be tested in the light of its purpose and object, the Examiner ruled out the proffered testimony of Smallwood, which, to complete the record, was stated to be as follows: Smallwood said, "We've got the right to picket the *customers* when you go there to pick up, and you know *your customers are not going to let people go out on strike* to give you freight. We will put you out of business." (Emphasis added) Further, Smallwood said that he had been instructed by the president of Local 728 that the law had been changed and that *they would picket the customers* when Brown Transport Company went to pick up freight. It was, of course, error for the Examiner to exclude this testimony in light of the fact that Smallwood's picketing subsequent to the start of the strike was the very conduct that was subject to interpretation, and his own prior characterization of it was certainly admissible. However, since the evidence was not introduced and since, therefore, the Local was given no opportunity to present Smallwood's testimony on the subject, which may well have contradicted what Hemmings said, we can not consider this as testimony that stands undisputed in the record. In light of the disposition we make of the case we need not remand on account of this erroneous exclusion of testimony.

The remaining instances which the Examiner and the Board impliedly accepted as true [5] may be outlined as fol-

5. In dealing with this testimony the Examiner stated, "In this specification charging party refers to 8 statements supposedly made by pickets to show 'the true concern of the union and its pickets.'

"For a charging party to be able to cite only eight statements, many of which are enigmatic, and some indicate mere human curiosity, by pickets during the course of picketing from April 30th to August 26th, and from a record of 1140 pages covering six pages [sic] of testimony, indicates to this Examiner that the pickets were, in fact, following their instructions not to talk. It is amazing to this Examiner that men engaged in an economic struggle with

lows: (1) Bennett, a picket for the Union, told Earl Brown at a time when Brown was parked alongside the street with a flat tire, that "they was going to town and picket someone else, that they could do more good with those that were picking up freight, because they weren't doing any good picketing me on that side of town"; (2) Bennett told Brown that, "they were picketing to hurt our business", further, Brown was requested to stay in the union but to continue to work and "bring them out information, referring to our freight or how our business was hurt, or whether we were picking up a lot of freight." (3) A picket named Coker stated to driver Duncan that he had followed Duncan's truck and it was loaded. Duncan testified that Coker said, "we was getting too much freight. He said they was going to have to do something about that." He said further that Duncan stated that "they had 80 cars of pickets they was going put on us that Monday." (4) A driver witness Hayes, testified to action by pickets Coker and Kennedy in preventing a trailer truck from going into the Chevrolet plant without the entrance being picketed. Characterizing their success by saying, "Boy, we pulled a good one on you yesterday," the witness said Coker stated "We saw Combs [another driver]. We knew where he was going. So we went up on the bridge. We knew he was going to Chevrolet to pick up, so we went up on the bridge; everytime we would see him coming towards Chevrolet, we'd run down and get on Industrial [Boulevard] and try to beat him down there; and everytime he would see us he'd just keep going. And he kept riding around and around in there so he saw we wasn't going to let him go in without picketing." Then in response to the question, "The conversation was that they kept Combs from getting into Chevrolet?" Hayes answered,

"Yes, sir." "Question: Is Chevrolet a good truck customer of Brown, Charlie? Answer: Yes, sir, a real good customer." (5) Witness Crews testified to a conversation with picket Boles. "Boles asked me where I was going next, I told him, Southern Wire and Iron. And that morning I didn't have but a couple of stops to make. He said, 'If we keep on cutting you down, you won't have anything to do.'" (6) Crews testified that on another occasion on which he said he had "lost the picket" before he got to a pick up place: "I told him I went to Kraft Foods. He said he sure wished he knew it, because they hated a bunch of pickets at Kraft Foods, like a hive of bees. Question: Did he say anything further about Kraft? Answer: He said that they were going to station a man at Kraft to watch for Brown's trucks when they came in there." (7) Testifying as to another conversation with picket Boles, Crews said, "Once before he asked me what happened at Gates Rubber. He said 'it seems like we've cut you out up there. You are not going up there to get freight anymore.'" (8) Crews testified that after he had been followed by pickets Boles and Bridges to the Gulf Overall Service Company, "Boles also told me there that it looked like they were going to cut us out, where we wouldn't have anything to do if they kept following us."

There was other evidence which the Examiner and the Board seems to have credited, which tended to support the petitioners' contention that the pickets did not follow the traditional methods of bringing their message home to the drivers, but to the contrary they picketed only where other union freight lines, trucks and employees were present. There was substantial testimony to the effect that where a single Brown truck was engaged in loading at neutral ground

their employer could have made so few comments in regard to that economic struggle.

"The undersigned believes that these statements may be disregarded as de minimis."

Thus, it appears that the Examiner accepted the truth of the testimony but considered it unworthy of consideration.

the pickets did not get out of their cars to picket, but when a truck of a union line appeared they immediately started picketing. There was substantial evidence to the effect that while the pickets followed the drivers and when the latter stopped to go in and find out whether there was freight to be picked up the pickets did not make any effort to picket the Brown truck or driver, but if freight was to be loaded, then the pickets started their activities, particularly if a union line truck appeared on the scene for the purpose of loading or unloading.[6]

A further fact, found by the Examiner to be true, but not considered by him to be signficant, was that the local continued to picket "when it was obvious that the Brown employees could not possibly observe the picket signs." This occurred by picketing at the entrance into the large Candler Warehouse area with approximately 100 neutral shippers served by a large number of trucks. On these occasions a picket was stationed at the gate and he continued to picket as long as the Brown truck driver was anywhere in the complex of warehouses, whether within sight of the picket sign or not, and occasionally picketing continued after the Brown driver had left the area unless this was actually known to the picket.

There was undisputed evidence to show that pickets regularly took down the numbers of trucks of other lines that worked behind the picket lines. No effort was made by the pickets or the other representatives of Local 728 to let the drivers of such trucks know the purpose of taking down the numbers of their vehicles.

Finally, it was undisputed that on at least two occasions, both of the two en-trances to the Candler Warehouse, a large city block area of warehouses and branch supply houses, regularly served by a large number of other lines' delivery trucks, were simultaneously picketed while a truck of the Brown Transport Company was somewhere in the warehouse area. It is also not in dispute that the following conversation occurred on one of these occasions when petitioner's witness testified that he asked Vaske, in charge of pickets, to remove the picket from one of the two entrances:

"Q. Which truck are you talking about now?

"A. The Brown Transportation truck. He stopped and the driver got out. I walked back over to Mr. Vaske. I said, 'Joe, the truck is here on this end of the warehouse where he can plainly see your picket.'

"Q. What end?

"A. The Murphy Avenue entrance. He can plainly see your picket and the picket can see him. He is going to be on this end of the warehouse the rest of the afternoon. I'll go down with you to take the picket from the other end and guarantee the truck will stay up here in view of your man. He didn't answer. And I asked him at that time was it his intention to stop the trucks from coming in and out of that whole warehouse. He didn't answer; he just smiled.

"Q. And as far as you know what happened? Were the pickets removed.

"A. When we left the pickets were still there.

---

6. Some samples of this testimony were as follows: Witness Duffy: "Well, if no more trucks were up there and I am the only truck there, or no more union truck lines there, then they don't picket." Witness Kitchens: "Well, on some days, if it was bad weather, they would sit in the car; and on other days, if there wasn't other carriers in there from other freight lines, then they would sit in the car." Witness Brown: "Well, if there wasn't no union trucks and I didn't get no freight, they would just sit there. They was sitting out in the street in their car until I was going to get freight or if there was union lines in there." Witness Hayes: "If there wasn't any trucks back up to the docks, loading freight, they wouldn't picket then. Question: What kind of trucks are you referring to? Answer, Well, union lines." Further testimony of this character was tendered in evidence but the trial Examiner excluded it on the ground that it was repetitious.

"Q. Where?

"A. On both ends."

The Examiner also credited testimony by a witness of one of the neutral shippers, a Mr. Norris, who stated that a picket, Boles, told him, "We are old friends, and I am working for Local 728, and you are giving freight to Brown Transport, and I would appreciate it if you did not do any business with them."

It is not infrequently the case that a petitioner, finding itself the loser in a trial before the Examiner, attacks the objectivity and impartiality of the trial Examiner. This is frequently to be expected where questions of credibility are before the Examiner and a party feels that such issues have been wrongly decided. By and large the courts find it unnecessary to comment on such contentions. Occasionally, however, where a reading of the record discloses something particularly noteworthy in this regard, we have not failed to make an appropriate comment. For instance, in N. L. R. B. v. Baker Hotel of Dallas, Inc., 5 Cir., 311 F.2d 528, in which the employer there severely criticized the Examiner as being biased in his fact finding, we said, at page 534:

"A careful reading of this record indicates that far from being biased, the examiner was careful in his rulings on the reception of evidence, and made findings on disputed items favoring respondent as well as the Board."

Here we feel it appropriate to say, to the contrary, that the Examiner's language throughout his report evidences an attitude of advocacy for his final conclusions to such an extent that it is difficult to separate argument from fact finding. Nevertheless, in the disposition we make of the case we do not find it necessary to overrule any fact findings of the Examiner or of the Board.

A careful review of the record requires that on the undisputed evidence in the record, we must conclude that the Board erred in accepting the findings of fact and report of the Examiner, and in dismissing the petitioner's complaint. In this regard we agree with the dissent of Board member Leedom and much for the reasons assigned by him in his dissenting opinion.

■ In spite of some difference in the views as to the proper application of the statutes between the courts of the several circuits, we think it clear that what we said in Superior Derrick Corporation v. N. L. R. B., 5 Cir., 273 F.2d 891, is a correct statement of the law.

"Congress has forbidden the use of the picket against the secondary employer to induce or encourage secondary employees to strike or refuse to perform services where an object is to force or require that the secondary employer cease doing business with the primary employer. That is a declaration of a positive policy [footnote omitted] which history records reflected great public dissatisfaction with the hapless predicament of the secondary employer caught in the middle. If *any* object of the picketing is to subject the secondary employer to forbidden pressure then the picketing is illegal. N. L. R. B. v. Truck Drivers & Helpers, Local 728 (National Trucking Co.), 5 Cir., 1956, 228 F.2d 791, 795; N. L. R. B. v. Dallas General Drivers, Local 745 (Associated Groceries), 5 Cir., 1959, 264 F.2d 642, 647–648. It need not be the sole or even main purpose."

■ Having stated in the Superior Derrick Corporation case that a picket line is a potent instrument having "a special message of its own," including that to a loyal unionist of a "spontaneous plea not to engage in any business activities with those behind the picket curtain and an instantaneous branding of 'unfairness' on those engaged in activity behind the picket line," we then stated in that opinion:

"[I]f there is an expectation or a hope or a desire that employees of the secondary employer will be induced or encouraged to take *con-

*certed* action so that the secondary employer will cease doing business with the primary employer, then the Act bars that activity. * * * The activity, including the picket line, must be conducted in such a way that the normal appeal of a picket line is overcome. It must be done so that all secondary employees will know that the primary union does not seek what the law forbids—pressure on the primary employer through pressure from the secondary employer because of concerted pressure of secondary employees on that secondary employer." 273 F.2d 891, 897.

In this case there is no dispute but that substantial pressure was actually placed on secondary employers. Long lines of trucks of other organized carriers immediately backed off from loading docks and lined up at the gates of the Candler Warehouse complex when a picket walked at the gate. It is without dispute that this same effect was produced elsewhere when a picket was stationed at the entrance to neutral property when a Brown truck was present. While, as we have stated, it is not the effect but the object that is to be tested, it is, of course, some proof that one of the *objects* of picketing is to bring pressure if it be certain to all involved that the picketing will produce that precise *effect*. It seems clear from this record that the only occasions when the picketing had no effect on other persons were those instances when the picket was permitted to enter the premises and take his stand right at the situs of the Brown truck and driver. Thus, no other truck or union employee was ever challenged not to cross a picket line.

All parties to this litigation recognize that certain criteria are normally considered by the Board and are recognized by the courts as having significance in their search for the true object when ambulatory picketing occurs. These are the criteria established by the Board in what is known as the Moore Dry Dock case. Moore Dry Dock Co., 92 NLRB 549. These criteria were, "(a) the picketing is strictly limited to times when the situs of the dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the situs; (c) the picketing is limited to places reasonably close to the location of the situs; and (d) the picketing discloses clearly that the dispute is with the primary employer."

The Board later added what may be considered a fifth criterion to the Moore Dry Dock rule in the Washington Coca-Cola Bottling case, Brewery and Beverage Drivers and Workers Local No. 67, and Washington Coca Cola Bottling Works, Inc., 107 NLRB 299. The Board decided that in cases involving ambulatory picketing it would hold as a matter of course that where the primary employer had a permanent establishment or place of business which could be picketed, then any picketing conducted at other locations, ostensibly for the purpose of appealing to primary employees at such locations, would nevertheless be violative of Section (8) (b) (4) of the Act.

Criticism of the use by the Board of such criteria as controlling in every situation produced a later modification of the rule in the Plauche case, Local Union 861 IBEW, and Plauche Electric, 135 NLRB 250. There, while not ruling out as one fact to be considered the fact that there was a primary situs where picketing could be carried on, the Board abandoned the arbitrary rule that the existence of such a primary situs carried with it the badge of illegality of picketing conducted elsewhere.

Thus it is that we conclude that the law applicable in this situation is as stated by us in the Superior Derrick case quoted from extensively above. It must be borne in mind that the modification of the Washington Coca Cola Bottling Company holding by the subsequent Plauche case does not eliminate the factor of presence of a primary place of business where picketing can be readily carried on as one of the important factors to be considered by the Board or by the

Courts when faced with a decision as to whether, under all the circumstances, it can be held that the improper pressure on third party employers is not *an* object of the ambulatory picketing.

Obviously, the best way for a fact finder to ascertain the purpose with which conduct is carried on is the honestly announced purpose by those participating in it. It rarely happens that those who are participating in something that is prohibited by law openly and avowedly announce their intention to perform the prohibited act. Thus it is that the courts pay especial attention to such statements against interest when in the unusual case it occurs that a party admits that his conduct, otherwise ambiguous, is for the improper purpose or objective. In such circumstances it would, of course, be entirely improper for the fact finder to disregard as "de minimis" statements made by the parties actually participating in the challenged conduct that could fairly be said to explain the purpose for which they were carrying it on. The evidence here unmistakably shows that many of the pickets knew and intended that their picketing would appeal to co-unionists engaged by other trucking lines to stop work back of the picket lines. When coupled with the observed fact that on occasions some 20 to 30 trucks immediately pulled away from loading docks and lined up inside the gates where the picket was walking, or many trucks lined up in the street outside the gates and refused to enter, and where, as found by the Examiner, no effort was made by the picket to make it plain to these third party employees that they were not to be involved, or that the picket was not attempting to appeal to them, the case must fall within the decision of this Court in the Superior Derrick case, supra. There, speaking of the fact that the signs themselves purported to inform the general public of this fact, we said:

"Of course this offers no automatic guide for union picketing at a common situs. By its nature, however, the purpose or intent of the picketing is not something which may be evaluated mechanically. And this is so whether it be by a sign, or a sign legend directing attention to a pamphlet, or a desire to obviate the uncertainties inherent in a recollection of what was orally said in response to all inquiries. See, e. g., N. L. R. B. v. Ferguson, 5 Cir., 1959, 257 F.2d 88."

▐ Moreover, we conclude that the Examiner and the Board both failed to apply criterion (c) in the Moore Dry Dock formulation, which all parties consider as essential in order to raise in favor of the Local the presumption of legality. This criterion is "the picketing is limited to places reasonably close to the location of the situs." This must necessarily mean that the picketing must be within the sight of the picketed employee of the primary employer. Otherwise there would be absolutely no basis for holding that the picketing was for the purpose of persuading him rather than the other persons who were within view of his sign.

Here it is undisputed that the instructions themselves directed the employees who were on the picket line, "In the event you are not granted permission to come upon the property for the purpose of picketing to close proximity to Brown's truck, you will picket just outside the property *at the entrance closest to the place* where the freight is being picked up and delivered. In that event, *said entrance is the only place* at which you will engage in picketing." (Emphasis added.) This instruction clearly authorized the pickets to do what they did in some instances, that is, picket at the entrance to neutral property when the Brown truck and driver were inside the premises, even though the entrance or gate was so far removed from the Brown truck as to have absolutely no conceivable effect on the driver as to whom the Local contended it was directing its picketing. For the pickets to have continued to walk the picket line at the entrance gate of a large complex like the Candler Warehouse area when the Brown truck and driver

were completely out of sight and when other truck lines vehicles were lining up 20 deep and refusing to enter or depart the entrance, is clearly violative of criterion (c). There is simply no excuse for picketing where the message is seen by neutral employees of neutral employers but is not seen at all by the employees of the primary employer.

On this point the Examiner answered the criticism of the petitioner that the Local "continued to picket when it was obvious that the Brown employees could not possibly observe the picket signs," by stating, "This did occur on occasions particularly when the operator of the property had refused entry on to that private property to the pickets.[7] And particularly at the Candler Warehouse, operated by Southeastern Industries, which is such a huge area crossed by a number of streets and covered with numerous buildings *frequently the Brown truck was obscured from the vision of the picket stationed at one of the two entrances to the area.*" (Emphasis added.) The Examiner then said, "If ambulatory picketing of this type is legal, and the property owners refused entry to the picket to picket next to the truck involved, then it would seem legitimate that it could continue its picketing even with the picketing truck out of sight, so long as that truck was on the premises." We conclude that this last statement by the Examiner, approved by the Board, is an incorrect statement of the law. Picketing that *has the effect* of interfering with the work of neutral third parties, and which *can not have the effect* of appealing to the employees of the primary employer can have no other purpose than that which *was actually achieved here in* blocking the entrance and exit to the Candler Warehouse premises to all other truckers.

The dissenting Board member in his opinion laid great stress upon the fact that Brown had its own separate terminal which the union picketed in support of its dispute with Brown. Brown's interchange drivers shuttled back and forth between Brown's terminal and the interchange point many times a day. Brown's pickup and delivery drivers, as well as interchange drivers, spent substantial amounts of time at Brown's terminal. See footnote 3 above. In his opinion the dissenting member thought that the Board had rejected the criteria of the place of picketing as one circumstance which it referred to in Plauche Electric, supra. He said: "Unlike the situation in Plauche where the primary employer had a shop at which his employees reported for a few minutes at the beginning and end of the working day, here the primary employees spent a good portion of each day at their employer's premises * * * It was apparent that, as the union could and effectively did, reach Brown's employees at Brown's terminal, the circumstance of picketing at the secondary premises becomes a factor of *overriding significance* in establishing that an objective of the picketing was to involve neutrals, i. e., that it was in fact directed also at the secondary employer and their employees." We agree with this analysis of the record.

We think the treatment given by the Board to the admitted fact that the numbers of the vehicles of the other Union drivers of other companies operating behind the picket lines were taken down by the pickets was also in error. This of itself was a threatening activity which, when unexplained (if in fact there is any reasonable explanation available), inevitably amounted to pressure on the employees of neutral employers, especially when they were members of the same Union which was on strike against petitioner. The dissenting opinion also, as do we here, criticized the treatment of the testimony of 8 witnesses as *de minimis*. It says, "I know of no case in which that doctrine has been applied in a secondary boycott situation, and I can not

---

7. Of course, the refusal or granting of privileges by the neutral property owners could not add to or detract from the right of the Local to carry on their activities in a legal manner.

conceive that such doctrine can be applied to statements *which reveal the object of admitted conduct*. Moreover, even assuming the doctrine could be applicable, it is in my opinion a misuse of the de minimis principle to apply it to the large number of statements involved herein." (Emphasis added.)

In sum, without the necessity of overruling any fact findings by the Examiner or the Board, we conclude that the record as a whole does not sustain the finding and conclusion that the picketing that went on in this case was not directed at the employees of third party employers. It follows, therefore, that the Board's order must be set aside and the case remanded to the Board for the entry of an appropriate injunctive order against Local 728.