NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LOCAL 825,A,B,C,D, INTERNATIONAL
UNION OF OPERATING ENGI-
NEERS, Respondent.

No. 80–1334.

United States Court of Appeals,
Third Circuit.

Submitted June 5, 1981.

Decided Sept. 18, 1981.

As Amended Nov. 18, 1981.

Rehearing and Rehearing In Banc
Denied Dec. 18, 1981.

Paul Elkind, Asst. Gen. Counsel for Contempt Litigation, Peter Ames Eveleth, Deputy Asst. Counsel for Contempt Litigation, Corinna Lothar Metcalf, N. L. R. B., Washington, D. C., for petitioner.

David Solomon, Schneider, Cohen, Solomon & Di Marzio, Jersey City, N. J., for respondent.

Before SEITZ, Chief Judge, and ROSENN and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

The National Labor Relations Board (the Board) moves this court for an order assessing a fine against Local 825,A,B,C,D, International Union of Operating Engineers (Local 825). The Board alleges that Local 825 disobeyed judgments entered by this court in 1963, 1966, and 1971. The Board also contends that Local 825 failed to comply with a purgation order entered in 1970 after this court found Local 825 in contempt. After the Board filed its motion, this court appointed a master to hear evidence and make recommended findings of fact and conclusions of law. The master found that Local 825 had not disobeyed this court's judgments and purgation order, and he therefore recommended that the Board's motion be denied. The Board filed exceptions to the master's report which we now address.

## I. FACTS

■ The Board's orders, as enforced by this court, direct that Local 825 cease and desist from coercing neutral employers, or from restraining neutral employees, with an objective of causing any neutral employer to cease doing business with a party to a labor dispute. *See, e. g., Local 825, International Union of Operating Engineers,* 138

N.L.R.B. 279 (1962), *enforced,* 322 F.2d 478 (3d Cir. 1963). In 1970, this court found Local 825 in contempt for having violated the court's 1963 and 1966 decrees. *See NLRB v. Local 825, International Union of Operating Engineers,* 430 F.2d 1225 (3d Cir. 1970), *cert. denied,* 401 U.S. 976, 91 S.Ct. 1200, 28 L.Ed.2d 326 (1971). The court directed that Local 825 purge itself of its contempt by, inter alia, complying with the decrees. The order also provided that Local 825's failure to purge itself of contempt would result in compliance fines of $10,000 for each violation of the decrees and of $1,000 for each day that such violation continued. *See NLRB v. Local 825,* 430 F.2d at 1229–30. The Board alleges that Local 825 violated this court's judgments and purgation order by engaging in secondary boycott activity at an East Brunswick, New Jersey jobsite during the period from July 19 to July 30, 1979, and at a Jackson Township, New Jersey jobsite on September 5 and 6, 1979.

### A. *East Brunswick Jobsite*

The East Brunswick jobsite is a twenty-five acre commercial development located on Route 18 in northern New Jersey.[1] The rectangular-shaped development runs along Route 18 for approximately 2,000 feet, with the main entrance in the middle of the development. A turn on Route 18 (the "jughandle") is located a short distance to the east of the main entrance.

R. H. Drukker & Co. (Drukker), a non-union general contractor, had a contract with Sigmacon Corp. (Red Lobster) and the Hartford Company (Hartford) to do site development work in East Brunswick on land owned by Robert Lehmann.[2] Red Lobster's property ran along Route 18 approximately 400 feet from the western end of the jobsite to a point halfway to the

---

1. Unless otherwise indicated, the facts set forth in this opinion either were found by the master or are supported by uncontradicted documentary and testimonial evidence.

2. The Board did not except to the master's reference to Lehmann as "developer and own-

er" of the East Brunswick jobsite. Indeed, the Board's brief also refers to Lehmann as "owner of the site," citing the master's finding for that point. We see no reason to question this statement of fact if the parties do not.

jughandle. A sign facing Route 18 announced: "Red Lobster Restaurant coming soon."

Drukker completed the initial site preparation for Red Lobster during the week of July 15, 1979. By July 19 Red Lobster was ready to proceed with the construction of its building, and Drukker had moved to the Hartford section in the center of the jobsite, several hundred feet behind the jughandle and about 500 feet from the Red Lobster project. Although a part of the Red Lobster-Drukker contract was yet to be performed, Drukker did not expect to start this work for approximately a month. Therefore, it was not scheduled to perform any work for Red Lobster during the period between July 19 and July 30.

The Board claims that, at 6:30 a. m. on July 19, Drukker's employees arrived for work at the Hartford jobsite and encountered between sixty and seventy-five Local 825 members picketing along Route 18. The picket signs carried by the Local 825 members stated that Drukker's employees were receiving "Less Than Local 825's Wages And Conditions[.] We Have No Dispute With Any Other Employer At This Site." Virtually all of the pickets were concentrated along Route 18 from the jughandle to the western end of the Red Lobster property. As a result, they covered the entire southern perimeter of the Red Lobster jobsite, including Red Lobster's entrance to its jobsite, which was located about 100 feet east of its western boundary off Route 18. When the pickets arrived, Drukker's equipment was parked along Route 18, but it was moved to the Hartford site that night and remained there for the rest of the period in issue. Picketing continued through July 30. As many as thirty pickets arrived at 6:00 a. m. each day, but by 8:00 a. m. only about fifteen pickets would remain along Route 18.

On the day the picketing began, Herve Goyette, job superintendent for Red Lobster, asked T. Allen Jones, a Local 825 business agent, why Local 825 was picketing along the perimeter of the Red Lobster jobsite. Jones replied that Drukker was working on the Red Lobster jobsite and had a large contract to do work for Red Lobster. Goyette then told Jones that Drukker's work was completed "at that time" and that Drukker was therefore no longer working on the Red Lobster jobsite. Goyette asked Jones whether he would remove the pickets if Goyette gave him a letter stating that Drukker was not working on the Red Lobster jobsite. Jones replied that if Goyette "could get a letter [Jones] would present it to his people and they would see what would happen." Goyette did not produce the letter.

On July 26, two public utility vehicles arrived at the Red Lobster jobsite to connect the electrical service for Red Lobster. An employee of Drukker testified that the pickets located along the Route 18 frontage "converged" on the trucks as they were turning into the Red Lobster jobsite. The trucks pulled onto the shoulder of Route 18 and left about one-half hour later without having entered the jobsite.

On July 30, Goyette asked Jones whether Red Lobster could proceed with the installation of the foundation for its building if it did not employ nonunion personnel. Jones stated that Red Lobster could proceed, but emphasized that he would extend the picket line back to the Red Lobster location as soon as he saw Drukker working on the Red Lobster jobsite. Jones then pulled the pickets away from the Red Lobster entrance, and work began on the restaurant for the first time since July 19.

A Denny's Restaurant (Denny's) was also being built on the East Brunswick jobsite, but Denny's did not have a contract with Drukker. When the picketing began, Denny's was ready to lay its foundation. Denny's jobsite was located in the middle of the project going from east to west. On July 27, William Castongue, job superintendent for Denny's, saw a truck with a delivery for Denny's drive to the entrance of the jobsite. Castongue saw the driver stop, get out of his truck, and speak to the pickets. Castongue explained that he was unable to hear 'the conversation between the driver and the pickets because his jobsite was lo-

cated too far away from the roadway. The truck did not enter the jobsite, and the delivery was not made to Denny's.

On that same day, Castongue spoke to Jones and asked him "what it would take" for Denny's to be able to "proceed with the project." Jones told Castongue that Denny's could proceed only if it used union people on the job. In reply to Castongue's question whether Local 825 would let Denny's concrete and backhoe people through the picket line if they were union members, Jones replied in the affirmative. He added, however, that "the first time that Drukker put a piece of equipment on [Denny's] job site he'd throw pickets around it." After Castongue agreed to use only union personnel, Denny's masonry subcontractor began work on the Denny's jobsite.

### B. *Jackson Township Jobsite*

D. T. Leeds, Inc. (Leeds), a nonunion plumbing and heating contractor, and Arthur J. Ogren, Inc. (Ogren), a general contractor, had separate contracts with the Board of Education of Jackson Township to do work at Goetz Elementary School. On August 27, 1979, pickets appeared at the jobsite carrying signs stating that Local 9 of the Plumbing and Fitters Union (Local 9) had a dispute with Leeds. As a result of this picketing, Leeds set up separate entrances: one was reserved for the employees and suppliers of Leeds; another was set up for the employees and suppliers of all other contractors and employers. The sign establishing the gate reserved for Leeds read: "Entrance No. 2. This entrance for employees, subcontractors, suppliers of D. T. Leeds, Inc. All others use Entrance No. 1." The sign for the neutral gate read: "This entrance not to be used by employees, subcontractors and suppliers of D. T. Leeds. All others use entrance 2." Leeds sent letters to the unions, including Local 825, and to the other contractors engaged on the job, advising them of the establishment of the separate gates and indicating their location. Leeds also informed all of its suppliers that a separate gate was being set up for their use.

On September 5, Local 825 members carrying signs indicating that Leeds did not pay Local 825's area standard wages and benefits picketed the neutral gate. Ogren job superintendent Charles Cox testified that when he arrived at the neutral gate a business agent for Local 825 told him that he would be crossing a picket line if he entered the jobsite. Cox saw the sign identifying the neutral gate behind the business agent, but he did not go to work that day. In the absence of Cox, no work was done on the Ogren job. Chester Hagenbarth, an Ogren officer, testified that he was unable to drive onto the jobsite because the pickets blocked his path. Hagenbarth testified that when he asked the pickets why Local 825 was present he was told that it was "supporting" the "plumbers' and pipe fitters' efforts to punish the owners for hiring a nonunion contractor." Hagenbarth left the jobsite without entering. Between four and six Local 825 members without picket signs were present across the street from the neutral gate on several occasions after September 5. At no time did Local 825 picket the reserved gate.

## II. DISCUSSION

Rule 53(e)(2) of the Federal Rules of Civil Procedure provides that "the court shall accept master's findings of fact unless clearly erroneous." Although the rule literally applies solely to the district courts, we think it should be applied here by analogy. *Accord, OCAW v. NLRB*, 547 F.2d 575, 580 (D.C.Cir. 1976), *cert. denied*, 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977); *NLRB v. Remington Rand, Inc.*, 130 F.2d 919, 952 (2d Cir. 1942). Nevertheless, "the mere fact that a [master's] finding is supported by substantial evidence does not prevent its being overturned if the reviewing court, with due regard for the master's opportunity to judge credibility, 'is left with the definite and firm conviction that a mistake has been committed.' " *OCAW*, 547 F.2d at 580 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)). Although the Board would have had to meet the easier burden of "preponderance of the evidence"

if it had chosen to proceed against Local 825 in an administrative unfair labor practice proceeding, in this civil contempt proceeding the Board must establish by "clear and convincing proof" that Local 825 violated the underlying decrees. *NLRB v. Local 825,* 430 F.2d at 1230.

Local 825 was engaged in primary disputes with Drukker and Leeds. Accordingly, it was entitled to bring pressure to bear upon Drukker and Leeds, but not upon the secondary employers at the East Brunswick or the Jackson Township jobsite. *See NLRB v. Denver Building & Construction Trades Council,* 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951). To establish a violation of the decrees, the language of which tracks the wording of section 8(b)(4)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(B) (1976), the Board must show that Local 825 induced or encouraged a cessation of work by employees or suppliers of a neutral employer with an object of forcing a neutral employer to cease doing business with another employer. *See, e. g., Carrier Air Conditioning Co. v. NLRB,* 547 F.2d 1178, 1188–89 (2d Cir. 1976), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977). To aid in discerning the fine line that often separates primary and secondary picketing, the Board in *Sailor's Union of the Pacific (Moore Dry Dock Co.),* 92 N.L.R.B. 547 (1950), established evidentiary standards that, while not absolute, are nevertheless helpful in determining whether an object of picketing at a common site was to induce a secondary boycott. Under these standards, picketing may be primary if it (1) is limited to times when the primary employer is present at the common site; (2) is limited to places reasonably close to the location of the primary's work; and (3) discloses clearly that the dispute is with the primary employer. *See id.* at 549.

### A. East Brunswick Jobsite

The Board challenges the master's legal conclusion that Local 825 engaged in lawful picketing of Drukker from July 19 through July 30, 1979. The Board also specifically excepts to many of the factual findings made and inferences drawn by the master in support of his legal conclusion. We need not address the many exceptions individually, however, because the dispute appears to break down into three principal issues that we believe are determinative of this motion for contempt: (1) whether the master was justified in not finding Local 825's picketing in front of the Red Lobster jobsite to be unlawful; (2) whether the master erred in not finding that Local 825 interfered with the delivery of supplies and services to the secondary employers; and (3) whether the master correctly concluded that Jones' statements to Goyette and Castongue did not constitute threats and coercion within the meaning of the decrees.

Local 825's picketing in front of the Red Lobster jobsite was not unlawful, because it did not have a secondary boycott as an object of the picketing. The Board directs our attention to evidence in the record indicating that Local 825 intended not only to inform the public of its dispute with Drukker but also to enmesh neutral employers in the dispute. This evidence consists of (1) the physical blocking of the entrance to the jobsite; (2) the presence of pickets on July 27 despite July 26 telegrams informing Local 825 that Drukker would not be working on the 27th; (3) the intimidatingly large number of pickets early in the morning relative to the small number of neutral subcontractors; (4) the smaller number of pickets present during normal business hours when informational picketing would seem most effective; and (5) the continued presence of the pickets at Red Lobster even after Jones had been informed of what may have been an obvious fact— that Drukker was not working there.

The master found that about fifteen pickets generally remained on Route 18 during business hours. We cannot find a record basis for disagreeing with the master's determination that this number was "not excessive or unreasonable" given the dimensions of the jobsite. Nor do we think that the master was clearly erroneous in using the number of pickets present at 8:00 a. m.

rather than the number of those present at 6:00 a. m. in assessing Local 825's object. The master could reasonably infer an object to inform the public of the primary dispute from the 8:00 a. m. figures and an object to inform the primary employer's employees from the 6:00 a. m. figures.

Furthermore, the fact that Drukker was not working on the Red Lobster jobsite during the picketing is not determinative of object. Red Lobster and Drukker remained under contract throughout the period at issue. Drukker had completed an initial phase of work immediately before the picketing, and it had another phase scheduled within a month. On the first day of picketing, Drukker still had equipment on the Red Lobster jobsite. Goyette had indicated to Jones on July 19 that he would produce a letter confirming his assertion that Drukker was no longer working for Red Lobster, but no letter was produced. Moreover, even when we review the master's finding as a legal conclusion and not as a factual determination, we do not believe that the Board has satisfied its burden of proving by "clear and convincing proof" that Local 825 was motivated by an unlawful object in picketing the Red Lobster jobsite.

■ We also are unable to disagree with the master's conclusion that Local 825's conduct was not "threatening" or "coercing". The master found both that the pickets did not interfere with the installation of Red Lobster's electrical service on July 26 and that there was insufficient evidence to show that the pickets were responsible for turning away Denny's suppliers. The statutory words "induce or encourage" include every form of influence and persuasion. See *IBEW v. NLRB*, 341 U.S. 694, 701–02, 71 S.Ct. 954, 958, 95 L.Ed. 1299 (1951). Thus, the convergence of the pickets on the utility trucks might support an inference that the truck drivers were restrained or threatened. An equally permissible inference that the drivers simply asked the pickets what was

going on and decided to support the union's efforts, however, can be drawn from the fact that the truck drivers pulled onto the shoulder and talked to the pickets. There was testimony that most of the truck drivers did not stop and converse with the pickets, but instead slowed down, saw the picket line, and kept on going. We do not believe on this record that the master clearly erred in drawing the inference that the drivers were neither threatened nor coerced, and certainly the evidence is not clear and convincing proof that the pickets actually coerced the drivers.

■ Finally, the Board argues that the direct threats made by Jones to Denny's and Red Lobster support a finding of coercion. Jones cautioned Goyette that he would "throw the picket [line] up" if "any nonunion people" returned to work, but he agreed to remove the pickets if Red Lobster used union personnel on the job. Goyette testified, however, that he understood that Local 825 would have to picket Drukker wherever Drukker worked, even if Drukker worked on the Red Lobster jobsite. He also admitted that neither Jones nor Local 825 ever "threatened" him. Indeed, to say that the union threatened Goyette seems to penalize Local 825 for attempting to comply with the *Moore Dry Dock* standards for primary picketing. See 92 N.L.R.B. at 549. Jones' statements to Castongue are more difficult to justify: Drukker had not worked for or had any contract with Denny's, and Jones' statements might be seen as a warning to avoid Drukker. It is not clear, however, that the statements made by Jones were anything other than indications of what the union would do if Drukker came onto the Denny's jobsite. Because Castongue initiated the conversation, we are not convinced that the master erred when he refused to find that these conversations constituted "threats" within the meaning of section 8(b)(4)(ii).[3]

3. The Board suggests that Local 825 violated this court's decrees and established an unlawful picket line as evidenced by conversations between Rhine Drukker and Jones. In these conversations, Jones allegedly indicated that

"there would be trouble" for Drukker if he did not sign a contract with Local 825. The union also allegedly undertook this picketing with only a minimal investigation of Drukker's wage and benefit schedule. The Board further ar-

In sum, we do not think that the Board proved clearly and convincingly that Local 825 had a secondary boycott as an object of its picketing, that it coerced employees or suppliers of neutral employers not to cross its picket line, or that Jones threatened either Denny's or Red Lobster with an object of preventing their contracting with Drukker. The master made the findings of fact that are essential to support his conclusions, and the Board's evidence does not "leave us with the definite and firm conviction" that the master's findings were wrong.

### B. Jackson Township Jobsite

The Board challenges both the master's conclusion that the picketing of Leeds by Local 825 constituted lawful area standards picketing and the master's factual findings supporting that conclusion. Analysis of this challenge also breaks down into three issues: (1) whether the master correctly concluded that Leeds failed to establish and post a reserved gate by the time the picketing began; (2) whether the master correctly determined that the union did not hinder secondary employees from entering the common jobsite; and (3) whether the master erred when he refused to find that the union's posting of observers after September 5 indicates that the picketing had a secondary object.

■ It is well established that a general contractor may, "by the use of separate gates for the purpose of ingress to and egress from the jobsite, lawfully force the union to picket only those 'separate gates.'" Local 519, United Association of Journeymen v. NLRB, 416 F.2d 1120, 1125 (D.C. Cir.1969). The master, however, found (a) that the sign posted at the neutral gate was confusing and that a neutral gate was not established; (b) that Leeds may have continued to use the "neutral" gate; and (c)

that the record did not prove that the sign identifying the neutral gate was posted on September 5 or 6 when the picketing commenced.

It does not appear that the misleading signs actually confused anyone, but as David Leeds, who posted the signs, admitted, the sign at the neutral gate did not authorize anyone to use the gate. Moreover, it is not clear that the sign at the neutral gate was posted when Local 825 commenced picketing at the Jackson Township jobsite. The sign identifying the neutral gate was torn down on September 4. There is evidence in Cox's log, although its meaning is disputed, indicating that no sign was posted on the morning of September 5 when Local 825 started picketing. Cox testified that he was "99.9 percent" certain that the sign was up when he arrived for work at 7:45, but because the picket line was already up by that time, his testimony would not necessarily indicate that the sign was posted when the picketing commenced. Some of the Board's evidence indicates that the sign was not posted until 7:15 a. m., well after the picketing had begun. In light of this evidence, we cannot say that the master clearly erred in concluding that the gate was not established and that the sign was not up at the critical time.

There was conflicting testimony whether Local 825 picketed on September 6. At one point in his testimony Cox stated that he saw Local 825 picketing at the neutral gate only on September 5, but he elsewhere said that he went through a picket line on September 6 to get his tools. One Local 9 member testified that September 6 was the only time that he saw Local 825 picket at the neutral gate. Thus, it is not clear that Local 825 picketed on more than one day, and it was not unreasonable for the master to refuse to find that picketing began on that day after the sign was reposted.

gues that police assistance was necessary to enable Drukker representatives and owner Robert Lehmann to enter the jobsite. Whether these incidents constitute illegal conduct need not concern us here. The Board admits that Local 825 had a primary dispute with Drukker, and this conduct certainly does not violate this court's injunctions against secondary boycott-

ing. Nor do we believe that the incidents with Drukker indicate that Local 825 had a secondary object. The fact that Lehmann was also hindered in entering the jobsite may be evidence of a secondary object, but given the evidence indicating solely a primary object, we do not think this evidence is determinative of the issue.

We agree that the absence of the primary employer's employees at the gate picketed is evidence of a secondary object. *See NLRB v. Local 254, Building Service Employees*, 359 F.2d 289, 292 (1st Cir. 1966). In *Brown Transport Corp. v. NLRB*, 334 F.2d 30 (5th Cir. 1964), in which the picket signs made clear that picketing was directed only to the employees of the primary employer and no one else, *see id.* at 31, the court held that "[t]here is simply no excuse for picketing where the message is seen by neutral employees of neutral employers but is not seen at all by the employees of the primary employer," *id.* at 39. That, however, is not the situation here. The picketing in this case was aimed at informing both the public and Leeds' employees of the wages and benefits received by the employees. Although Leeds argues that it did not use the neutral gate, there is some suggestion in Hagenbarth's testimony that Leeds' "people were using [the] main gate during the time [the] project was shut down by picketing." Thus, we do not think that the Board has shown by clear and convincing evidence that Local 825's picketing was motivated by a secondary object.

The master found that no one was prevented from entering the jobsite. This finding is fully supported by the record. For example, there is evidence indicating that Local 825 pickets merely informed Cox that he was crossing a picket line. As to Hagenbarth, it is true that when he turned into the site "he could not continue without running [the pickets] over." On the other hand, after talking to the pickets and learning that Cox was not there, Hagenbarth admits that he "just backed out because there was no reason for [him] to be there," not because he was prevented from entering. The Board fails to show that the master clearly erred when he found that Ogren's employees were not restrained from entering the jobsite. While a picket line certainly "induces" employees not to cross, informational picketing is permissible. We do not believe that the Board has proved by clear and convincing evidence that this informational picketing was somehow more coercive than other area standards picketing.

Finally, the Board offers as further proof of Local 825's unlawful object its patrolling without signs across the street from the neutral gate for several weeks after the picketing. There is no requirement that pickets carry signs. The Board argues that "signal picketing," that is, activity that acts as a signal to neutrals that sympathetic action on their part is desired, is unlawful. *See Bridge Workers Local 433 v. NLRB*, 598 F.2d 1154, 1158 and n.6, 1159 (9th Cir. 1979). It is not clear, however, that the observers here were doing anything other than ensuring that Leeds did not use the neutral gate. The observers were not wearing picket signs; they did not identify themselves as Local 825 members; they did not stop anyone from entering the jobsite; they did not talk to anyone; and they were across the street, at least thirty to thirty-five feet away from the main gate.

Although some of the Board's many objections to the master's findings of fact may be meritorious, we believe that the master made the findings that are essential to uphold his conclusions and that those findings are not clearly wrong. As with the East Brunswick jobsite, we do not believe that the Board has shown error in the master's conclusion that the evidence failed to prove clearly and convincingly that Local 825 has violated the underlying decrees. Thus, we adopt the master's report with its recommendation that Local 825 not be adjudged guilty of civil contempt.

### III.

The Board's motion for sanctions will be denied.

ROSENN, Circuit Judge, dissenting.

I respectfully dissent because I believe the Board proved, by clear and convincing evidence, a classic case of illegal secondary activity and deliberate violations of this court's previous judgments and its purgation order of October 8, 1970. I have a definite and firm conviction that the Master

was mistaken with respect to several critical findings of fact and that his conclusions of law run counter to firmly established principles governing secondary boycotts and common situs picketing. Accordingly, I would reject his recommendations and adjudicate Local 825 in further civil contempt and require it to take the steps in purgation requested in the Board's motion.

## I.

### A. East Brunswick

The Union's purported "area standards" picketing of R. H. Drukker & Co. ("Drukker") occurred at what was to become the East Brunswick Plaza, a complex of service establishments and office buildings being developed by Robert Lehmann. The Special Master, the Union in its brief to this court, and now the majority, have all treated the entire Plaza project as a single job-site and have accordingly applied principles relevant to common situs picketing to this aspect of the case. I will discuss my views on those principles and their application in Part II of this opinion and for the moment I mention only what I consider to be a serious factual error on which the "common situs" approach is apparently predicated.

In his Finding No. 12, the Master states that "Drukker ... was engaged in site preparation work at the East Brunswick site, under contract with, *inter alia*, [Hartford, Red Lobster] ... and Robert Lehman [*sic*], developer and owner of the site ...." The Master's transcript references to this statement provide no support for the assertion that the entire Plaza tract was owned by Lehmann, and the record reveals a contrary set of facts. Both Rhine Drukker and Castongue, General Superintendent for Denny's, testified that Lehmann did not own the entire tract, but that Denny's and others owned their own development sites. Further, statements made by Herve Goyette, Field Superintendent for Red Lobster, are consistent with the notion that Red

Lobster owned the property on which it was building its restaurant.

I therefore believe that this case centers around Union activities on no less than three worksites: Denny's, Red Lobster's, and Hartford. Such an approach is consistent with the geographic features of the development project. The entire Plaza tract fronted on Route 18 for 2000 feet. Red Lobster's frontage accounted for only one-fifth of the total. Denny's was located behind Red Lobster and had no frontage on Route 18. The Plaza tract was divided into ten parcels (Red Lobster and Denny's being located on two of the smallest), in addition to parcels reserved for Lehmann's use for landscaping and water detention sites. The Hartford property, the largest parcel in the development, was 500 feet away from Red Lobster and, like Denny's, had no Route 18 frontage.

Contracting for construction on each of the foregoing sites proceeded separately and independently. Red Lobster engaged Drukker to do the initial site preparation work for a restaurant building. Drukker commenced the work on July 5 and completed it by July 19. It thereupon moved to the Hartford site and accordingly, the Master found that "by July 19, Drukker was working on the Hartford (McIntosh Motor Inn) section of the site, behind the jughandle located approximately in the center of Route 18 frontage." (Finding No. 13).

On July 13, Allen Jones, business agent for Local 825, while driving along Route 18, became aware of Drukker's presence on the Red Lobster site and inquired of the job superintendent "who Drukker was," and the nature of the operation. Leaving his business card, he left word for Drukker to get in touch with him as soon as possible; otherwise, there would be trouble. (Finding No. 14). Although Drukker's superintendent had only a two-man crew and two pieces of equipment (Finding No. 13),[1]

---

1. Drukker's two pieces of equipment (a bulldozer and compactor) were parked along the Route 18 frontage when the pickets arrived but they were moved later in the day to the Hart-

ford site where they remained for the period between July 19 and July 30. Although the Master made a finding to this effect (Finding No. 13), he subsequently made an inconsistent

when they arrived for work at the Hartford job site on July 19, there were between 50 to 70 pickets patrolling the entire 400 foot length of the Red Lobster property, including Red Lobster's exclusive entrance to the site. The picket signs, printed in red and black lettering, but with Drukker's name inserted lightly in ink, gave notice that Drukker's employees "at this site are receiving less than Local 825's area standard wages and conditions."

Although Drukker was expected to return to the Red Lobster site in about a month to pave, it did no work for Red Lobster, nor was it scheduled to perform any work, between July 19 and July 30. Its superintendent and two employees and two pieces of equipment were engaged only on the Hartford site during this period. Nonetheless, the pickets continued to patrol each morning thereafter along Route 18 from the "jug handle" to and including the entire length of the Red Lobster site. After the first day 30 to 40 pickets appeared each morning when the men reported for work, diminishing to about 15 by 8:00 A.M. with 5 or 6 pickets at the rear entrance to the development.

When Goyette, Red Lobster's job superintendent, arrived at the Red Lobster site on the morning of July 19, he sought Jones out and informed him that Drukker's work was complete "at that time" and that it was no longer working on the Red Lobster site. When Rhine Drukker, a principal of Drukker, learned of the picketing on July 19, he arranged to meet Jones the following day. At that time Jones asked Drukker about the extent of its work on the East Brunswick development and if he, Jones, could put some of his own men to work. When

Drukker indicated concern for the jobs of his employees, Jones said it "would really be impossible" for Drukker's employees to gain admission to Local 825 and that the work would have to be performed by their members. Drukker claims and Jones denies that Jones thereupon gave Drukker a copy of the Local 825 labor contract and requested him to sign it. Although the Master found there was such a meeting between Drukker and Jones, he made no findings as to what was discussed. Nor did he make any findings concerning Drukker's unchallenged testimony that later that morning Jones again asked Drukker to sign a contract with Local 825.

Picketing continued daily until July 30. Goyette again spoke to Jones on July 30 and inquired whether Red Lobster could proceed with the installation of the foundations for its building if it did not employ non-union labor. Jones replied in the affirmative but warned that he would "throw pickets up" once he saw any non-union workers on the Red Lobster site. Thus, with this parting admonition, construction of the Red Lobster building commenced on July 30.[2]

Red Lobster's masonry subcontractors, scheduled to lay the foundations for the building during this period, were unable to perform any work on the job site from July 19 until July 30 because of the picketing. Although the Master made this finding, he also found (Finding No. 22), in the face of evidence to the contrary, that there is "an absolute void in the record on the part of the Board to prove that some violation on the part of Local 825 resulted in the failure of the masonry contractor to appear." However, Goyette testified that the mason-

---

finding "that defendant continued to have his equipment on the job site (July 27)." (Finding No. 24).

**2.** The Master confused Goyette's conversation on July 30 with Goyette's earlier conversation with Jones on July 19. The pickets did not leave this site on July 20 as erroneously found by the Master. (Finding No. 20). Furthermore, the Master's finding that Goyette falsely represented that Drukker had no more work to perform for Red Lobster "since Drukker and Red

Lobster had merely pretended that there was no contract between them" was irrelevant. The issue, entirely overlooked by the Master, was whether Drukker had completed its work, at least phase one, and had removed its employees and equipment from the Red Lobster site. There is no evidence in this record that Drukker did any work on the Red Lobster site during the period in issue. On the contrary, there is evidence that Drukker performed no work there between July 19 and July 30.

ry contractor was unionized and that he would not cross the picket line "and even if he did, then he would be unable to receive any concrete." Goyette also testified that on the morning of July 25, while he was in the trailer office, he was threatened by a large man from the picket line who swore at him and verbally abused him. Because of his fear of bodily injury, he did not return to the job site the next day and remained away until July 30. Goyette conceded that when he showed up on the job site on July 26, the pickets permitted him to pass through, although they did administer a verbal tongue lashing. One of the pickets on the Red Lobster premises called Goyette a "bald headed queer bastard and you come outside and I'm going to beat your goddamn head in." On July 25, public utility vehicles arrived at the Red Lobster site to make the electrical installation. "[T]he pickets converged on the two vehicles and they pulled off onto the shoulder of Route 18" and after waiting a half hour they decided to leave without entering the site.

On July 11, 1979, CBR Developments, a wholly owned subsidiary of Denny's, broke ground on the East Brunswick development for a new facility. The work was to be performed by subcontractors but Drukker was not one of them; it had not performed any work for Denny's. The Denny's site was about 300 feet from the Red Lobster property. On July 19, pickets also appeared at the Denny property and returned daily to picket. Concrete, door frames, and other material bound for the Denny construction were turned away. On July 27 Denny's job superintendent, Castongue, spoke to Jones and asked him "what it would take" for Denny's to be able to "proceed with the project." Although Denny's had no relationship whatsoever with Drukker, Castongue testified that Jones told him that the only way Denny's was going to do any work was if it "used union people on the job. He was very adamant about that and repeated that we would have to be union all the way."

Although the Master found that "Local 825 had a labor dispute at the East Brunswick site only with Drukker," (Finding No. 28), the Master concluded that there was no credible evidence that the pickets were responsible for the turning away of Denny's suppliers. He reached this conclusion by holding that direct evidence of what the pickets said to the truckdrivers was necessary to find inducement. After Castongue agreed to use union labor only, Denny's masonry subcontractor commenced work on Denny's site for the first time since the picketing began.

### B. The Jackson Township School Site

In the spring of 1979, Leeds, a non-union contractor, commenced plumbing and drainage work and Ogren, a general contractor, undertook general construction work on an addition to the Goetz School pursuant to a contract with the Township Board of Education. Because of picketing by Local 9, Plumbers and Pipefitters Union, and by Local –89– of the International Association of Heat and Frost Insulators, commenced about the end of August, Leeds set up separate entrances at the Goetz School, reserving one exclusively for Leeds and its suppliers (entrance No. 2) and designating the other entrance (entrance No. 1) for all other subcontractors and suppliers. Simultaneously, Leeds sent letters to the two locals, the school board, and the other contractors notifying them of this action and fixing the location of the gates. On August 27 Leeds wrote to its suppliers informing them of its separate entrance on the Trenton-Lakewood Road accompanied by a map and a request to use this entrance No. 2 for all deliveries. On August 29 Leeds wrote to Local 825, the school board, and all other contractors giving notice of the separate gates, and advising them that the entrance "now in use by all contractors will remain in use and be designated No. 1 to be used by all other contractors, etc., but not by D. T. Leeds, Inc." The letter concluded with a request that Local 825 picket Leeds at entrance No. 2.

The Board's evidence pertaining to the picketing at the school site is unrefuted; Local 825 did not present any evidence. This evidence establishes that on September

5, Local 825 picketed the neutral gates on Patterson Drive with signs stating that Leeds did not pay Local 825 area wages and standards. When Cox, Ogren's job superintendent, arrived at the site on the morning of September 5 and found Local 825 picketing the neutral entrance, he stopped at the picket line. White, a business agent for Local 825, came over, introduced himself, and told Cox he would be crossing a picket line if Cox went to work. Cox withdrew and returned the next day to get his tools to work elsewhere. In his absence, no work was performed by his work crew under the Ogren contract. Furthermore, Ogren's subcontractors failed to work. When Cox returned for his tools on September 6, he again saw pickets at the neutral gate.

When Hagenbarth, an officer of Ogren, arrived at the neutral gate on September 5, he saw 15 to 20 pickets at the entrance. The pickets occupied the roadway to the entrance and thereby obstructed his ability to enter the job site. When he inquired of the pickets why Local 825 was there, he was informed that it was "supporting the plumbers' and pipefitters' efforts to punish the owners for hiring a nonunion contractor." Hagenbarth drove around to the Leeds' reserve gate and found pickets there from the two other locals. However, Local 825 never picketed this reserve gate. After September 6, four to six members of Local 825 lingered across from the main (neutral) gate without signs where they sat on their cars. Although the language on the gate signs was inartistically drafted, the undisputed evidence is that it left no confusion among the employees on the job site as to which gate they were to use. The gate signs were torn down on September 4, but were restored by Leeds' foreman, Alessandrini, about 7:15 A.M. on September 5.

3. This court enforced a broad order entered in 1963 against Local 825, *NLRB v. Local 825, International Union of Operating Engineers*, 322 F.2d 478 (3d Cir. 1963), when general counsel for the NLRB excepted to the narrower order of the trial examiner in the proceedings reported in Local 825, International Union of Operating Engineers, 138 NLRB 279 (1962).

## II.

The decrees entered by this court in 1963 and again in 1966 against Local 825 prohibited, *inter alia*, the Local, its officers, agents, and representatives from "inducing or encouraging any individual" employed by any employer to engage in a strike or refusal in the course of his or her employment to transport or otherwise handle or work on any goods or materials or perform any services; "or threatening, restraining, or coercing any employer where, in either case, an object thereof is to force or require . . . any employer or persons to cease doing business with . . . any other employer or persons." [3]

On October 8, 1970, we entered a further decree against Local 825, its officers, agents, and representatives enforcing another order of the Board adjudging them in civil contempt for having violated the court's decrees entered in 1962 and 1963 and directed Local 825 to purge itself of the civil contempt. *NLRB v. Local 825, International Union of Operating Engineers*, 430 F.2d 1225 (3d Cir.), *cert. denied*, 401 U.S. 976, 91 S.Ct. 1200, 28 L.Ed.2d 326 (1970). Thereafter, on October 27, 1971, this court entered an additional decree enforcing another order of the Board issued February 13, 1967. Our order of October 27, 1971, barred Local 825, its officers, agents, and representatives from

inducing or encouraging any individual employed by . . . any . . . person engaged in commerce or an industry affecting commerce, to engage in a strike or a refusal in the course of his employment to perform any services; or threatening, coercing, or restraining . . . any . . . person engaged in commerce or industry affecting commerce, where, in either case, an object thereof is to force or require . . . any . . . person . . . to cease doing business with . . . any other person.

The Board agreed with General Counsel that a broad order was necessary "because of the extent to which [Local 825 and the named officers] have demonstrated a proclivity to engage in unlawful secondary activities in furtherance of their disputes with these and other primary employers." *Id.* at 280 (footnotes omitted).

Because of serious Congressional concern over the coercive involvement of third parties in labor disputes not their own, Congress in 1959 amended the National Labor Relations Act by adding section 8(b)(4)(B), 29 U.S.C. § 158(b)(4)(B):

This concern was focused on the "secondary boycott" which was conceived of as pressure brought to bear, "not upon the employer who alone is a party [to a dispute] but upon some third party who has no concern in it" with the objective of forcing the third party to bring pressure on the employer to agree to the union's demands.

*NLRB v. Local 825, International Union of Operating Engineers*, 400 U.S. 297, 302–03, 91 S.Ct. 402, 405–06, 27 L.Ed.2d 398 (1971) (footnotes omitted).

Local 825 ostensibly picketed the Red Lobster and Denny's construction sites to inform Drukker's employees and the public, according to the picket signs, that workers "operating power driven construction equipment at this job site are receiving less than Local 825's area standard wages and conditions." But there is no evidence in this record that Local 825 had any reliable basis for this information. It failed to verify with Drukker or any reliable source the information it was disseminating.[4] Furthermore, Denny's had not engaged Drukker to do any work for it; it had no contract with Drukker. None of Drukker's equipment was on Denny's property, nor were any of its employees. If the picketing was purely informational and not intended to induce or encourage anyone performing services for Red Lobster or Denny's to cease doing so, picketing nevertheless continued at the Red Lobster site even after Drukker had completed the first phase of its work there and had removed all of its equipment. For the following period of 11 days, a period when only the masonry subcontractor, Troy Stifler, was scheduled to lay the foundations, the pickets appeared daily en masse. If this was simply innocent informational picketing, one must ask how Local 825 can account for 50–75 pickets massed along Red Lobster's 400 foot front, particularly when the primary contractor and his employees were no longer there? Even if they were, the presence of 50–75 pickets reveals more than an informational purpose, especially when the employer had only two employees and a supervisor on the site to be informed. The picketing effectively shut down the Red Lobster and Denny's construction as the subcontractors refused to work and the suppliers refused to cross the picket line.

As alluded to earlier, I believe the Master, the Union, and the majority rely improperly on principles applicable to common situs picketing in gauging the legality of the Union's actions in this case. The picketing at East Brunswick Plaza affected ongoing work at no less than three independently owned jobsites, each of which was under development by separate general contractors. Two of those contractors and owners had no contacts with the primary employer during the time the pickets were patrolling their jobsites. To sustain the legality of the Union activity affecting Red Lobster and Denny's is no different, in my view, from announcing a rule of law authorizing a labor organization to shut down construction on a group of homes being built separately by individual owners merely because the Union has a dispute with an electrician wiring someone else's home across the street. It requires little sustained consideration, and no citation of authority, to realize that such a result completely frustrates Congress' intent in enacting section 8(b)(4)(B).

However, even if application of *Moore Dry Dock*[5] standards were appropriate to this case, and there had been compliance with them, where the activities or state-

---

4. The Master's finding that Local 825 engaged in area standard picketing was predicated on the testimony of the business agent Jones that several of his pickets, none of whom he could identify, told him that Denny's was not paying the area standard. Jones admitted that he "never spoke to Drukker at all before putting up the picket lines."

5. *Sailors' Union of the Pacific*, 92 N.L.R.B. 547 (1950); *see* maj. op., at 384.

ments of the union reveal any illegal secondary purpose, such conduct is unlawful. *Texas Distributors, Inc. v. Local Union No. 100,* 598 F.2d 393, 398 (5th Cir. 1979); *Local Union No. 369, International Brotherhood of Electrical Workers,* 229 N.L.R.B. 68, 72 (1977). First, Local 825 did not comply with the *Moore Drydock* standards because at the time of the picketing—July 19 to July 30—Drukker, the primary employer, was not engaged in any business activity on the Red Lobster or Denny's site. That being so, the picketing on these properties could not have been within the sight of employees of the primary employer to persuade them. Thus the only reasonable conclusion to be drawn is that the purpose of the picketing was to apply pressure to the neutral employers. "A picket line is a potent instrument." *Superior Derrick Corp. v. NLRB,* 273 F.2d 891, 896 (5th Cir. 1960), and in the long history of the trade union movement, "it has a special message of its own. To a loyal unionist it is both a spontaneous plea not to engage in any business activity with those behind the picket curtain and an instantaneous branding of 'unfairness' on those engaged in activities behind the picket line." *Id.* at 896. In the instant case, this is illustrated by Red Lobster's masonry contractor's refusal to cross the picket line and his recognition that even if he did, concrete suppliers would not.

Picketing Denny's premises, when the primary contractor Drukker was neither there nor under contract, and the Red Lobster's premises after the primary employer had, as the Master found, moved his equipment and employees to the motel site, could not have been informational. The picketing amounted to a direct application of pressure on vulnerable neutral companies to induce them—at the very least, to encourage them—to cease or refrain from doing business with Drukker.[6]

The intended breadth of the words "induced or encouraged" in section 8(b)(4)(A) is emphasized by their contrast with the restricted phrases used in other parts of section 8(b) .... The scope of "induced" and especially of "encouraged" goes beyond each of them.

*International Brotherhood of Electrical Workers v. NLRB,* 341 U.S. 694, 703, 71 S.Ct. 954, 959, 95 L.Ed. 1299 (1951). Thus, an allowance of picketing of neutral employers, regardless of how peaceful the picketing may be, "would be to open the door to the customary means of eliciting the support of employees to bring economic pressure to bear on their employer." *Id.* It would be destructive of the purpose of section 8(b)(4). Implicit in the 1959 amendment to section 8(b)(4) of the Taft-Hartley Act, 29 U.S.C. § 158(b), is a Congressional recognition of the devastating effect secondary picketing can have on a neutral employer.

The objective of the picketing can shed considerable illumination in ascertaining whether Local 825 induced or encouraged employees, subcontractors, and suppliers of Red Lobster and Denny's to refuse to work on their construction. The statute and our previous judgments forbid any activity which seeks to induce or encourage a person not the primary employer or an employee of his to take some action as to refuse to perform services or to do business with the primary employer.

The cases recognize the very practical fact that, intended or not, sought for or not, aimed for or not, employees and neutral parties do take action sympathetic with strikers and do put pressure on their own employers.

*Seafarers International Union v. NLRB,* 265 F.2d 585, 590 (D.C.Cir.1959). One of the most effective means of applying such pressure is to picket a neutral place of business, relying on the union adherent's traditional aversion to crossing a picket

---

**6.** The Union apparently draws solace from testimony of Denny's Castongue that his company had no intention of doing business with Drukker. The Union apparently believes that such testimony necessarily precludes attribution of an illegal object to the picketing because Denny's, as a neutral, had no way of pressuring Drukker. In light of the Denny's picketing, however, the clear import of Jones' statements to Castongue was that if *any* non-union workers, especially Drukker, appeared on the Denny's site, operations would be shut down.

line. The purpose of our decrees, as it is of the statute, is to protect unoffending employers from this extraordinary pressure.

The Master concluded that Local 825 engaged in lawful area standards common situs picketing of Drukker from July 19 to July 30, but he made no attempt to analyze the purpose of the picketing at the Red Lobster and Denny's properties. Some questions that immediately confront us and to which the Master provided no answers are: first, could it truly have been area standards informational picketing when Jones had no information on what Drukker was paying his employees or what their standards of employment were? Jones says he relied for this information on what one of his pickets told him. Second, considering that Drukker merely had a bulldozer and compactor operated by only two employees, did it require 50 to 75 pickets to patrol 400 feet of Red Lobster property for informational purposes, particularly when Red Lobster had an exclusive entrance to its property? Third, if this was simply informational picketing and not an appeal for a secondary boycott, was massive picketing required at the Red Lobster property when in fact Drukker had no equipment or employees there?

The Master found that the large number of pickets was required because they were patrolling 2,000 feet along the highway. However, the only construction on that 2,000 feet at that time was on the Red Lobster property. There is no evidence of any construction at the time of any other site fronting on Route 18 in the development. The Master saw no impropriety because Red Lobster had a contract with Drukker for performance of additional work at some subsequent time. But how can the existence of such a contract lend credence to informational picketing when the primary employer has no employees on the premises of the neutral employer to be enlightened? Furthermore, Drukker had no contract with Denny's, had never done any work for them, and none of its employees were on Denny's property. Nonetheless, Denny's was still the victim of Local 825's campaign for enlightenment. The Master gave these facts no consideration whatsoever and makes no allusion to them. The conclusion is inescapable that the picketing campaign had the planned and expected effect of denying the services of all union workmen and suppliers of the neutral employers unless they committed themselves to disassociate then and in the future from Drukker or other non-union workmen. As soon as this illegal objective of the picketing had been achieved, the pickets were removed.

There are other factors, also ignored by the Master, which point to Local 825's calculated plan to violate this court's decrees and which do not support the Local's claim of innocent, informational picketing. First, if its activities were merely informational, no explanation is offered for Jones' insistence to Drukker that the work to be performed be rendered by Local 825 members and that membership was not available for Drukker's employees in this local. "The result is that [Local 825's] picketing in order to attain its ultimate purpose, must have included among its objects that of forcing [Red Lobster] to terminate [the] subcontract." *NLRB v. Denver Building and Construction Trades Council*, 314 U.S. 675, 688, 71 S.Ct. 943, 951, 95 L.Ed. 1284 (1951).

Second, on July 30 Jones withdrew Local 825 pickets from the Red Lobster property when their project superintendent assured Jones he would use only union labor to lay the foundation. Jones, however, threatened to "throw pickets up" if any non-union workers appeared at the site. This definitely demonstrates that Jones was interested in cutting off business with non-union contractors, not the mere dissemination of information.

Third, when Denny's job superintendent, Castongue, inquired of Jones on July 27 "what it would take" to be able to proceed with their construction, he was repeatedly warned by Jones that Denny's could do so only if they "used union people on the job." Here, too, when Denny's agreed to use union labor, its masonry subcontractor was for the first time permitted to commence work

since the picketing began. Again, it is obvious that the picketing was not merely informational. On the contrary, the picketing was blatantly intended to induce Red Lobster to discontinue business with Drukker, a non-union contractor, and it succeeded. The picketing had also been intended to induce or encourage Denny's to refrain from using non-union contractors and subcontractors and there too it succeeded.

Finally, the Master completely ignored direct testimony from Castongue that he was threatened and abused as he crossed the line and while working at the Red Lobster site. This is not mere information, it is plainly and simply threats and coercion directed at a neutral employer. The picketing was intended to appeal to secondary employees not to cross the picket line or to perform services despite the lack of any presence of the primary contractor on the premises of the neutrals, and it met with obvious success. As an appeal to secondary employees, it was illegal. *NLRB v. Denver Building and Construction Trades Council*, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).

### III.

Local 825's activity at the East Jackson site falls within the same proscriptions of the law and this court's previous orders. When Leeds first encountered picketing at the school site, it immediately established two separate entrances. It reserved one for its employees and suppliers; it set up the other for employees of all other contractors and their employers. Leeds scrupulously adhered to its reserve gate. Although the signs designating the gates were not drafted precisely, they were supported by letters to all interested parties, including Local 825, that clearly identified the separate entrances.

The Master, however, found that the sign posted caused such confusion that it failed to establish a reserve gate. His references to the record, however, do not support this finding. In fact, the uncontradicted evidence is to the contrary. Cox, the construction superintendent for Arthur Ogren, Inc., the general contractor, personally refused to cross the picket line except with the consent of Local 825 to pick up his tools. He testified that the signs did not create confusion among the employees on the job site. Leeds, under cross-examination, also testified that "nobody was confused at the site." [7] The Master, obviously uncomfortable with his finding, further compounded the error with an alternate finding that even if it be assumed that a reserve gate was established "it cannot be found by clear and convincing evidence that Leeds' employees and other contractors were not also using the neutral gate instead of the reserve gate which they attempted to establish." (Finding No. 36). This finding incomprehensibly places the burden of proof on the Board to negatively establish what otherwise should be an affirmative defense of the Union, if it exists at all. The record is absolutely devoid of any evidence that Leeds or its contractors were using the neutral gate once the reserve gate was established.

Although the Master found that on September 5 Local 825 picketed the main entrance on Patterson Drive, (Finding No. 36), he was unable to find that the sign attempting to establish a reserve gate was posted "since there was great confusion even among the witnesses for the Board as to whether the picketing was done on September 5, or September 6, and further whether the sign attempting to establish the reserve gate was even posted at the time." (Finding No. 36). Ochs, in charge of the picketing for the Heating and Pipefitters Local, testified to the contrary, stating

---

7. This testimony is further supported by the testimony of David Ochs, in charge of the picketing on this development for the International Association of Heat and Frost Insulators, Local 89, that his local picketed Leeds at the main entrance to the project on September 4 and 5. But after those dates they picketed only at "the restricted gate" on the Trenton-Lakewood Road. For the remainder of their picketing, they never picketed the main gate although Ochs appeared there to observe what was going on. At the main gate the only picketing he observed was by Local 825 pickets carrying signs and by no other union.

that he observed picketing at the main gate September 5 and 6. Cox also contradicted the Master's finding. He even sought Local 825's permission to cross the picket line on September 6 to withdraw his tools. Hagenbarth's testimony also contradicted the Master's finding. No evidence in the record supports it.[8]

It is firmly established that in common situs construction, one contractor may establish separate gates for the purpose of ingress and egress from the job site and thereby lawfully force the union to picket only the primary gate. *Local 519 v. NLRB,* 416 F.2d 1120, 1125 (D.C.Cir.1969). To carry out the legislative purpose embodied in the secondary boycott amendments, a union must under such circumstances limit its picketing to areas reasonably proximate to the gate used by the primary contractor's employees and suppliers. *See Local 761, International Union of Electrical, Radio, and Machine Workers v. NLRB,* 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961); *Markwell and Hartz, Inc. v. NLRB,* 387 F.2d 79, 81–83 (5th Cir. 1967), *cert. denied,* 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968). The record in this case clearly and convincingly establishes that Local 825 picketed the neutral gate; it never picketed the gate reserved for Leeds. The absence of Leeds' employees at the main gate is evidence of the secondary objective of the picketing. *Painters District Council No. 38,* 153 N.L.R.B. 797, 800–01 (1965); *NLRB v. Local 254 Building Service Employees,* 359 F.2d 289, 291 (1st Cir. 1966). "There is simply no excuse for picketing where the message is seen by neutral employees of neutral employers but is not seen at all by the employees of the primary employer." *Brown Transport Co. v. NLRB,* 334 F.2d 30, 39 (5th Cir. 1964).

Accordingly, I would reject the recommendations of the Master and adjudicate Local 825 in further civil contempt and require that it take the steps in purgation requested in the Board's motion.

---

8. In a feeble effort to support his finding, the Master seized upon a small portion of Cox's testimony given under cross-examination that the signs had been torn down before Cox reported for work and were not present thereafter. Cox's amplified testimony, however, revealed that he personally did not observe the signs being torn down since he did not report for work until about a half hour after the signs had been restored by Alessandrini, Leeds' plumbing foreman. The record shows that the gate signs were torn down during the day of September 4 and that Alessandrini replaced them on September 5 about 7:15 A.M. immediately after starting his work. Cox testified that he was almost 100% certain that the signs were up when he arrived for work at 7:45 A.M. on September 5 and he described seeing it behind White, the business agent, as he spoke to him. This testimony is uncontradicted, and there is no testimony to indicate that the sign identifying the main gate was not posted on September 6. In substance, the Master's finding depends on Cox's testimony concerning an entry in his log indicating "no signs on main entrance" on September 6. Cox explained, however, that this entry referred *not to a gate sign,* but *to picket signs.*