**TURNER CONSTRUCTION COMPANY and Nine Penn Center Associates, L.P.**

v.

**FIRST INDEMNITY OF AMERICA INSURANCE COMPANY.**

Civ. A. No. 91–3328.

United States District Court, E.D. Pennsylvania.

June 1, 1993.

Sam L. Warshawer, Jr., Venzie, Phillips & Warshawer, Philadelphia, PA, for plaintiffs.

Roy S. Cohen, Cohen & Huntington, P.C., Philadelphia, PA, for First Indem. of America Ins. Co.

### MEMORANDUM

DALZELL, District Judge.

This non-jury action arises out of difficulties encountered in the construction of a large atrium space frame built on the east side of Mellon Bank Center, a fifty-five story office building plaintiff Turner Construction Company erected at 1735 Market Street in Philadelphia, Pennsylvania.

Turner contracted with a French-owned entity, Space U.S.A., Inc., doing business as IBG International ("IBG"), to build the space frame to the specifications of the project's architect, Kohn, Pederson, Fox Associates, P.C. ("KPF"). When in September of 1990 it became apparent that IBG would be unable to complete its contract with Turner to build the atrium, Turner looked to First Indemnity of America Insurance Company ("FIA"), IBG's surety, to perform IBG's contract.

FIA's response was litigation, first against Space Engineering Company of Paris. When FIA failed to advance the completion

of the space frame, Turner itself proceeded to arrange for the finishing of IBG's work, and advised FIA that it would be sued for all losses.

By its filing of the present diversity action, Turner made good on this advice.

*Procedural Background*

Shortly after this action was transferred to our docket,[1] we suggested to the parties that, given the unusually complex and highly technical nature of the factual disputes between them, it might serve all concerned to appoint a Special Master to resolve such issues. The parties responded positively to this suggestion and, consequently, by an October 6, 1992 Order we appointed John Rauch, A.I.A., as Special Master in this action to "hear the evidence and make the findings of fact as to all of the non-legal issues in this case."

After the Special Master conducted a preliminary conference, he conducted hearings in Philadelphia during the course of fourteen days between December 10, 1992 and January 6, 1993. Mr. Rauch heard the testimony of eleven witnesses, including experts both sides offered. The deposition testimony of five additional witnesses was submitted to the Special Master during the fifteenth day of hearings. The Special Master also received many exhibits, and after hearing protracted final oral arguments on February 2, 1993 spent twenty days analyzing the record and drafting his findings. He rendered his findings of fact on March 3, 1993.

We ordered the parties to serve their objections and responses to the Special Master's findings of fact to the Special Master, and on April 1 and April 2, 1993, held a hearing at which FIA's counsel exhaustively questioned the Special Master about FIA's objections to the findings of fact.

In his 487 detailed findings, the Special Master concluded, in essence, that FIA failed timely and responsibly to investigate and respond to Turner's claims under the surety bonds made in consequence of IBG's default. The Special Master found that the excess cost and expenses Turner reasonably incurred in completing IBG's work totalled $1,045,940.75.

Pursuant to Fed.R.Civ.P. 53(e) and 52(a), the plaintiffs moved that we adopt the Special Master's findings, as well as make our conclusions of law based thereon and direct the entry of judgment in their favor. FIA has filed its objections to certain of the Special Master's findings, and has prayed for judgment in its favor.

*Legal Standard Governing Review of the Special Master's Findings*

Fed.R.Civ.P. 53(e)(2) provides, in relevant part, that "In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous." *See also NLRB v. International Union of Operating Engineers*, 659 F.2d 379, 383 (3d Cir. 1981).

■ In applying Rule 53's "clearly erroneous" standard, the Supreme Court has stated that it requires affirmation of the Special Master's findings unless the district court is left ". . . with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *Operating Engineers, supra*, 659 F.2d at 383; *Ray v. Safeway Stores, Inc.*, 614 F.2d 729, 730 (10th Cir.1980). This review standard is congruent with that which Courts of Appeal apply when they review district courts' Rule 52 findings. *See generally*, Charles A. Wright and Arthur R. Miller, 9 *Federal Practice and Procedure*, Civil, § 2614 at 809–810 (1971) (". . . exactly the same as the standard governing review by court of appeals of findings of fact by a district court. . . .").

For the reasons stated below, we do not believe that FIA has begun to carry the heavy burden Rule 53(e)(2) imposes on it, and we therefore adopt the Special Master's findings of fact *in toto* and reject FIA's objections.

---

1. We have jurisdiction because of the parties' diverse citizenship, and the amount in controversy far exceeds the jurisdictional minimum.

*Essential Facts*

■ As noted above, the Special Master made 487 detailed findings of fact. FIA has, in fact, only objected to 39 of those factual findings. We therefore regard 448 of the findings as unobjected to.[2]

Given the comprehensiveness of these findings, as well as their ample support in the voluminous record made before him, it is unnecessary to do little more than paraphrase the summary findings the Special Master provided in the first seven pages of his March 3, 1993 Findings of Fact.

Nine Penn Center Associates, L.P. ("NPCA") is the owner of what is now known as the Mellon Bank Center, a fifty-five story office building in Philadelphia fronting on Market Street on its south, and bounded by 18th Street on the west, John F. Kennedy Boulevard on the north, and other structures on the east.

NPCA hired Turner to be the general contractor of the Mellon Bank Center project under an agreement dated May 2, 1988. Under this agreement, Turner submitted to NPCA a Guaranteed Maximum Price Proposal of $148,263,050, for which Turner would be paid an original contractor's fee of $3,424,-150. The agreement called for a substantial completion date of December 1, 1990, and stated that if the work were not substantially completed "within ninety days after the date for Substantial Completion (i.e., by March 1, 1991)" Turner would pay, as liquidated damages, approximately $850,000, or 25% of its contractor's fee (Finding 21). NPCA never released Turner from the March 1, 1991 liquidated damages assessment date.

Turner began work on the Mellon Bank Center project in May of 1988.

After considering alternatives, NPCA, in a May 11, 1989 letter, instructed Turner to solicit bids for an atrium space frame installation, based upon performance specifications KPF had prepared, to be built to the east of the office tower at 1735 Market Street. The KPF specifications required the space frame contractor to do all the engineering and final design work in connection with the space frame, the fixed skylight and the curtainwall in conformity with aesthetic, engineering and performance criteria. The space frame contractor was further required to fabricate and construct these three elements (space frame, skylight, and curtainwall) based upon designs KPF would approve.

Although Turner had in March of 1989 allocated a budget of $1.5 million for the atrium space frame enclosure, it was based upon early and incomplete documentation, and was in any event intended to be conservative (Findings 31–32).

After IBG approached Turner, IBG was permitted to respond to the June 27, 1989 invitation to bid. IBG was the low bidder among five that submitted completed bids. After adjustments, IBG's proposal was $1,338,952. Further negotiations between Turner and IBG refined the agreed price to $1,288,000.

Although FIA made much of the fact that IBG's bid was 16.88% lower than the next lowest bidder's, the expert testimony amply supports the Special Master's finding that this differential "was not a cause for concern or alarm" (Finding 48, quoting and crediting the testimony of Mic Patterson, plaintiffs' expert).

IBG, as the successful bidder for the atrium space frame, knew from the bid specifications that it had to provide surety bonds for the work. On September 29, 1989, FIA provided Turner with a letter that notified Turner that FIA "... will issue 100 percent Performance and Payment Bonds on Turner Construction Company bond form for [IBG] for approximately" $1.2 million to $1.3 million "to furnish and install the space frame, skylights and curtain walls at the Atrium...." (Finding 72). At the time of this September 29, 1989 notice, IBG had not yet commenced performance and, therefore, contrary to some

---

2. To the extent FIA makes the generic objection that the Special Master did not accept its proposed findings, we overrule it as not beginning to demonstrate the clarity of erroneousness Rule 53(e)(2) requires before we may refuse to adopt a Special Master's findings. Given the particular-

ized reasons the Special Master gave for all but his summary findings, we see no basis to overrule them merely on the vaporousness of generalized objections. *See Newspaper Readers Serv., Inc. v. Canonsburg Pottery Co.,* 81 F.Supp. 99 (W.D.Pa.1948).

of FIA's more expansive assertions, IBG could not have been in default at that time.

Following receipt of FIA's letter, on October 2, 1989, Turner formally awarded IBG the contract for the atrium space frame enclosure for the lump-sum of $1,288,000. FIA's bonds with respect to IBG's contract were ultimately dated February 7, 1990, in the penal sum of $1,288,000 on each bond. Even FIA's expert acknowledged that the following clause in the subject Performance Bond was typical in the industry: FIA "... hereby waives notice of any alteration of extension of time made by Obligee" (Finding 85, and exhibits of testimony cited therein). The record amply supports the Special Master's Finding 95, contrary to FIA's objection, that IBG was not in default in any material way as of the date FIA formally executed the surety bonds.

Shortly after entering into its October, 1989 contract with Turner, IBG began to design and ultimately to fabricate the work. By July of 1990, the space frame components had been fabricated in France and were shipped to the United States. By that same date, the skylight and curtainwall components were in fabrication and painting. Given the weighty support for these conclusions in the record, we find nothing clearly erroneous in Findings 96 through 147 that confirm the Special Master's summary conclusion VI that under such circumstances, "Turner did not consider IBG to be in default, irrevocably or otherwise" during this over-nine month period.

Ironically, in view of FIA's later contentions, from February through July of 1990 FIA never asked Turner or IBG for any information or report on the status of IBG's work, notwithstanding the frequent contact that took place between FIA's Paul Alongi and IBG's employees or officers on other, unrelated matters (Findings 160–161). In so doing, FIA failed to follow its own practices and procedures (Findings 164, 168–170 and 178).

It was not until late July of 1990 that both Turner and FIA learned for the first time that IBG had, in fact, failed to pay certain of its suppliers. In early September, Turner learned that IBG's financial condition had deteriorated so badly that work came to a complete halt because of IBG's failure to pay its suppliers. Turner advised FIA of this grave situation, and on September 28, 1990, Turner formally declared IBG in default (Finding 192). Paul Alongi, FIA's claims manager, recommended that Turner should declare IBG in such default so that FIA could "take action" (Finding 191). The record before the Special Master fully supports his Findings, detailed at 179 through 194 and 484 through 487, that Turner reasonably concluded that IBG was not in default before September 28, 1990, and not irrevocably or incurably [3] so until October 29, 1990, the date of a climactic meeting between Turner and FIA (Findings 223–231).

When Turner called upon it to perform as surety, FIA began litigation in this court (Finding 214). An effort to obtain an injunction to compel the turnover of the space frame components by Space Engineering Company of Paris to FIA failed to resolve the problem. This earlier litigation was never adjudicated since the complaint was dis-

---

3. Because it was evident that the date of irrevocable default would be important in order to analyse FIA's claims here, as well as to help us determine the viability of a proffered defense, on December 4, 1992, we ordered the Special Master

 to adduce the evidence he deems necessary in order to make findings of fact as to the following:

 (a) When FIA informed Turner that it was issuing the bond in question;

 (b) The reasonableness of Turner's reliance on such notice under the custom prevailing in the relevant industry;

 (c) The materiality of IBG's default before Turner received such notice, if any; and

 (d) When Turner should have concluded, consistent with reasonable industry experience, that IBG was irrevocably in default.

The Special Master duly answered these questions at Findings 481 through 487.

At the hearing on the Special Master's Findings, it became apparent to us that our use of the word "irrevocable" was less meaningful in a construction industry context than "incurable". We therefore asked the Special Master, "If I changed the word irrevocable to incurable, would it have changed the dates you found ...?" The Special Master answered that it would not have changed the dates mentioned in his Findings. See Tr. of April 2, 1993 at 77.

missed pursuant to Stipulation and Consent Order of this Court dated December 7, 1990 (O'Neill, J.).

When FIA failed to respond to Turner's formal October 22, 1990 written demand on FIA to perform as surety, Turner proceeded to make arrangements to complete IBG's work, and advised FIA that it would sue it for all losses.

FIA has not questioned the Special Master's Findings, detailed at Nos. 234 through 264, that concluded that Turner's arrangements to complete IBG's work were fair and reasonable under the circumstances. FIA has not objected to the Special Master's calculation of Turner's legitimate excess costs and expenses of $1,045,940.75, meticulously canvassed in Findings 345 through 473. These sums to do not include interest, attorney's fees or "other litigation expenses" (Finding 474).

The essence of FIA's objections to the Special Master's findings of fact is that Turner waited too long to declare a default and that an earlier declaration of default would have enabled FIA to have assured completion of the atrium space frame for far less than the excess sums Turner incurred. After reviewing the Special Master's Findings 289 through 344 and 478 through 480, we find that none is clearly erroneous. To the contrary, the record fully supports the Special Master's summary in paragraph XII of these findings (p. 6), as follows:

> The claim that [FIA] would have actively monitored IBG's performance if notified earlier is belied by its total inaction at all pertinent times, even after it was directly involved in IBG's problems. The suggestion that it would have reprocured the work earlier ignores the significant problems of reprocurement in the technically complex field of space frame construction. FIA has offered no credible evidence that any of Plaintiffs' completion costs would have been saved by an earlier default.

Certain [of] FIA's witnesses lacked credibility,[4] were inconsistent and contradictory in their testimony and did not have the experience to credibly support their opinions. Finally, FIA's own failure to act was the proximate cause of a very large part of the excess completion costs for which they do not now wish to be responsible.

We therefore adopt the Special Master's findings and reject FIA's objections to them.

*Conclusions of Law*

Having adopted the Special Master's findings, we turn now to the conclusions of law that flow from those findings.

*Liability and Compensatory Damages*

██ Under Pennsylvania law,[5] "the liability of a surety is coextensive with that of the principal, and accordingly, a surety is bound to perform whatever may be legally required of its principal." *Diversified Utilities Sales, Inc. v. Monte Fusco Excavating Contracting Co.,* 71 F.R.D. 661, 664 (E.D.Pa. 1976). Furthermore, when a performance bond surety fails to complete its principal's work, the surety is "liable for the loss plaintiff sustained, not exceeding the amount of the bond" because of the surety's breach of its "absolute undertaking to erect and complete the building". *Purdy v. Massey,* 306 Pa. 288, 159 A. 545, 547 (1932).

██ In the instant case, Turner declared IBG, the principal, in default on September 28, 1990 (Finding 192). Under the subcontract, Turner was then entitled to take control of the premises and hire anyone necessary to complete IBG's work. *See* Finding 81; IBG–Turner Subcontract ("Subcontract") ¶ XI, Exhibit P–5 to Turner's brief in support of motion for adoption of Special Master's report, conclusions of law and judgment ("Turner's brief").

If the costs of completing IBG's work exceeded the unpaid balance on the Subcontract, then under the Subcontract IBG was required to reimburse Turner "not only [for]

---

4. Although Rule 53(e)(2) precludes our second-guessing of this kind of determination, our experience with FIA witnesses in August of 1992, in connection with FIA's motion to disqualify Turner's counsel, led us independently to reach the same credibility conclusion Mr. Rauch did. *See*

the discussion of plaintiffs' motion for Rule 11 sanctions, *infra.*

5. The parties agree that Pennsylvania law governs this action.

the costs of completing the work ... but also [for] all losses, damages, costs and expenses, including legal fees and disbursements sustained, incurred or suffered by reason of or resulting from the Subcontractor's default". *Id.* Moreover, IBG "and its Surety agree[d] to promptly pay all lawful claims of subcontractors, materialmen, laborers, persons, firms or corporations for labor or services performed or materials ... and other items furnished ... and to indemnify ... [Turner] of and from all liability loss, damage and expense ... which [Turner] ... may sustain by reason of IBG's failure to do so." The parties incorporated these provisions by reference into FIA's performance bond. *See* Finding 82; Performance Bond, Ex. P–7 to Turner's brief.

The Special Master found that Turner's "legitimate" cost for completing IBG's work—not including interest, attorney fees, court costs and other litigation expenses—exceeded the subcontract balance by $1,045,-940.75 (Findings 471–477).[6] Therefore, under the Subcontract and Pennsylvania law, both IBG and FIA are liable for this amount.

### FIA's Defenses

FIA does not dispute that, under normal circumstances, Pennsylvania law holds a surety liable for the reasonable costs an obligee incurs as a result of the principal's default. It suggests, however, that there are facts specific to this case that relieve it of its liability on the bonds.

### (a) *Estoppel*

 First, FIA contends that Turner should be estopped from recovering under the bonds because Turner could have declared IBG in default on the Subcontract before the bonds became effective and did not inform FIA of this fact. FIA's brief in support of motion for adoption of its proposed conclusions of law ("FIA's brief") at 3–8 (*citing St. Paul Fire & Marine Insurance Co. v. Commodity Credit Corp.*, 646 F.2d 1064 (5th Cir.1981)). This argument must fail, however, because Turner could not have declared IBG in default before the bonds became effective.

According to FIA, a bond does not become effective until it is legally "issued", that is, until it is both executed and delivered. FIA's brief at 2 (*citing* Pa.Law Encyclopedia *Suretyship,* §§ 26, 27 (1961)). Under this theory, the bonds here did not become effective until February 7, 1990 when they were delivered to Turner. Using this date, it was arguable that IBG was in default on the Subcontract, which was executed on October 2, 1989, before the bonds became effective.

The Special Master, however, came to a contrary factual conclusion regarding the intended date of effectiveness. Although he agreed that the Subcontract was physically executed in October, he found that "FIA did not condition its [September 29, 1990] letter in any way", "expected and intended that Turner would rely upon its letter in awarding the subcontract to IBG", and that "Turner in fact relied upon FIA's letter in awarding the subcontract to IBG" (Findings 73 through 75). On these findings, it was impossible for IBG to have been in default before FIA became committed on the bonds (*see also* Findings 77–78 and 481–483).

Pennsylvania statutory law confirms the conclusion that FIA's letter of intent on September 29, 1990 as a matter of industry practice and FIA's express words constituted a binding and enforceable surety contract even before execution and delivery of the bonds in their final form. 8 Pa.S.A. § 1 provides:

§ 1. **What constitutes contract of suretyship**

Every written agreement hereafter made by one person to another for the default of another shall subject such person to the liabilities of suretyship, and shall confer upon him the rights incident thereto, unless such agreement shall contain in substance the words: "This is not intended to be a contract of suretyship," or unless each portion of such agreement intended to

---

6. "FIA has not shown that these costs ... were unfair or unreasonable in amount" (Finding 476). The Special Master disallowed $82,501.42 Turner had claimed for "supervision and over-head", "additional inspection", and a few other, and minor, payments (*see* Findings 443 through 463 and 392 and 393).

modify the rights and liabilities of surety-ship shall contain in substance the words: "This portion of the agreement is not intended to impose the liability of surety-ship."

FIA's September 29, 1990 letter to Turner stated without reservation that it would

issue 100 percent Performance and Payment Bonds on Turner Construction Company bond form for [IBG] for approximately $1,200,000.00 to $1,300,000.00 to furnish and install the space frame skylights and curtain walls at the Atrium ...

(Finding 72). As the Special Master found, this letter conveyed FIA's unqualified agreement to become a surety for IBG (Findings 73, 77, 481), and that Lynch both expected and intended Turner to rely upon it in entering the Subcontract with IBG (Finding 482). The Special Master also found that Turner's reliance on the letter was in accordance with industry custom (Findings 76, 482).

Under these circumstances, FIA's letter as a matter of law constituted a contract of suretyship under 8 Pa.S.A. § 1, which immediately subjected FIA to "the liability of suretyship". The bonds therefore became effective and enforceable on September 29, 1990, and because the Subcontract was not executed until October, it was impossible for IBG to have been in default before the bonds became effective.

Even if we accepted FIA's contention that the surety contract was not effective until February 7, 1990, however, FIA's assertion that Turner "could have" declared IBG in default before February 7, 1990 is completely unrealistic and unsupported by the Special Master's findings. These findings make clear that Turner would have been both imprudent and irresponsible to declare IBG in default as early as February of 1990. Although it is true that IBG was beginning to experience trouble meeting certain interim milestone dates prior to February 7 (Findings 107, 118–119), Turner did not believe that IBG's tardiness in any way jeopardized the more important Project completion date or the liquidated damages assessment date (Finding 120). Moreover, the Special Master

found that Turner's decisions not to declare IBG in default at this early date and not to provide notice of the schedule problems to FIA were "consistent with the Subcontract, Turner procedure and practice in the industry" (Finding 312). Even FIA's own expert opined that Turner could not have placed IBG in default until mid-February (Findings 293–294).

In any case, FIA, a sophisticated construction contract bond surety company, cannot fault Turner for failing to disclose the fact that IBG had missed some minor interim milestone dates set forth in the Subcontract. As a surety, FIA has a duty to seek out important information that is available to it. *St. Paul Fire & Marine, supra,* 646 F.2d at 1072. Moreover, the Subcontract and bonds did not by their terms require Turner to notify FIA of IBG's failure to meet subcontract milestones (Finding 156). FIA cannot neglect to ask questions and then avoid liability by accusing Turner of failing to disclose information that Turner was not required to disclose under the surety contract.

(b) *Duty to Mitigate*

FIA's second defense is that Turner violated its duty to mitigate damages. Specifically, FIA contends that Turner failed to mitigate damages when it refused to declare IBG in default before September 1990 despite IBG's having regularly missed milestone deadlines.

In support of this assertion, FIA cites Pennsylvania law to the effect that:

a party who suffers a loss due to a breach of contract has a duty to make reasonable efforts to mitigate his losses. Put another way, the amount recoverable by the damaged party must be reduced by the amount of losses which could have been avoided by that party's reasonable efforts to avoid them.

*State Public School Bldg. Authority v. W.M. Anderson Co.,* 49 Pa.Commw. 420, 423, 410 A.2d 1329, 1331 (1980) (citations omitted). Although Turner refuses to concede that it had a duty to mitigate in the instant case,[7]

7. Turner contends that a duty to mitigate does not arise until there has been a known injury.

we need not address Turner's refusal because even if we accept FIA's contention that Turner had such a duty, the Special Master's findings of fact make clear that Turner made the "reasonable efforts to mitigate [the] losses" that Pennsylvania law requires.

Specifically, the Special Master found that even though IBG missed interim milestone dates, Turner's policy, which is "typical in the space frame construction industry", is to "allow subcontractors to perform in accordance with revised working schedules, provided Turner's obligations to ownership regarding completion of the entire project are not jeopardized." (Findings 298, 299). Because Turner is "almost always" able to solve "problems with subcontractors lagging behind schedule ... without default and without notifying the surety" (Finding 301), it is Turner's policy only to declare a default when the subcontractor has stopped or is no longer able to perform the work (Finding 305). Turner was not here aware that IBG's work had come to a halt until September of 1990 (Finding 187). Consistent with these findings, the Special Master ultimately found that

> the decision by Turner's project staff not to provide notice of schedule problems to FIA and not to declare IBG in default and to allow IBG to perform in accordance with revised working schedules through August, 1990, was consistent with the Subcontract, Turner procedure and practice in the industry.

(Finding 312). Under these circumstances, we cannot find that Turner violated its duty to mitigate by acting unreasonably in failing to default IBG prior to September 1990.

Because we conclude that both FIA's estoppel and mitigation of damages defenses are unsupported by the facts and law, we will find in favor of Turner and order that FIA reimburse Turner $1,045,940.75, the full amount of completion costs over the Subcontract balance (see Findings 471–473).

### Other Damage Elements

In addition to compensatory damages, Turner seeks to recover prejudgment interest, bad faith damages under 42 Pa.C.S.A. § 8371, attorney's fees and its share of the Special Master's compensation. We shall consider these claims in turn.

### (a) Prejudgment Interest

■ With regard to Turner's claim for prejudgment interest, the Pennsylvania Supreme Court directs that:

> In all cases of contract interest is allowable at the legal rate from the time payment is withheld after it has become the duty of the debtor to make such payment; allowance of such interest does not depend upon discretion but is a legal right.

*Palmgreen v. Palmer's Garage, Inc.,* 383 Pa. 105, 108, 117 A.2d 721, 722 (1955); *see also Buford v. Wilmington Trust Co.,* 841 F.2d 51, 56 (3d Cir.1988). Under this rule, the awarding of prejudgment interest on a contract action involving liquidated sums is mandatory, not discretionary, and the interest due is calculated from the date on which the money became due or payable. *American Enka Co. v. Wicaco Machine Corp.,* 686 F.2d 1050, 1057 (3d Cir.1982); *Black Gold Coal Corp. v. Shawville Coal Co.,* 730 F.2d 941, 943 (3d Cir.1984).

■ At the very latest, FIA's duty to pay Turner under the surety agreement arose upon the completion of space frame in June of 1991 (Finding 264). We will therefore award Turner prejudgment interest at Pennsylvania's legal rate of interest, six percent, *see* 41 Pa.S.A. § 202, calculated from July 1, 1991, which comes to $120,178.59.[8]

---

Turner's brief at 8–10 (*citing* Black's Law Dictionary, 5th ed. at 904 (the mitigation of damages doctrine "imposes on an injured party duty to exercise reasonable diligence and ordinary care in attempting to minimize his damages after injury has been inflicted")). Because Turner believed until September of 1990 that IBG was still performing work (Findings 106–146, 187–188), Turner argues that there was no known injury until that date, and, therefore, it was under no obligation to mitigate damages.

8. From July 1, 1991 through the date of this decision, there was the whole of 1992 plus 334/365ths of a non-leap year, or 1.915 years. This period times 6.0% simple interest, times the base of $1,045,940.75, equals $120,178.59.

(b) *Bad Faith under 42 Pa.C.S.A. § 8371*

▮ With respect to Turner's claims for superinterest and attorney's fees, Turner refers us to 42 Pa.C.S.A. § 8371. That statute provides, in pertinent part:

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

Traditionally, "bad faith" in the insurance context

is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Coyne v. Allstate Insurance Co.,* 771 F.Supp. 673, 677 (E.D.Pa.1991) (Ludwig, J.) (*quoting* Black's Law Dictionary 139 (6th ed. 1990)). We can also identify bad faith conduct, however, by reference to the Pennsylvania Unfair Insurance Practices Act ("UIPA"), 40 Pa.S.A. §§ 1171.1–1171.15, because courts recognize that the "unfair and deceptive acts or practices" the UIPA proscribes constitute acts of "bad faith" for purposes of § 8371. *See Coyne,* 771 F.Supp. at 678 (*citing D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Co.,* 494 Pa. 501, 431 A.2d 966, 969–70 (1981) ("Although the seriousness of 'bad faith' conduct by insurance carriers cannot go unrecognized, our Legislature has already made dramatic, sweeping efforts to curb the bad faith conduct.... [T]he Unfair Insurance Practices Act serves adequately to deter bad faith conduct.")).

▮ Turner contends that much of FIA's conduct here constitutes conduct the UIPA prohibits. Specifically, Turner alleges that FIA violated the following provisions of the UIPA by:

(a)(2) Making, issuing, publishing or circulating in any manner an advertisement, announcement or statement containing any representation or statement with respect to the business of insurance or with respect to any person in the conduct of his insurance business which is untrue, deceptive or misleading.

\* \* \* \* \* \*

(a)(10) Any of the following acts if committed or performed with such frequency as to indicate a business practice shall constitute unfair claim settlement or compromise practices.

\* \* \* \* \* \*

(ii) Failing to acknowledge and act promptly upon written or oral communications with respect to claims arising under insurance policies.

(iii) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.

(iv) Refusing to pay claims without conducting a reasonable investigation based upon all available information.

(v) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed and communicated to the company or its representative.

(vi) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear.

40 Pa.S.A. § 1171.5.

As to the alleged violations of § 1171.-5(a)(10), Turner has proffered no evidence that FIA engaged in the prohibited conduct with "such frequency as to indicate a business practice." Instead, Turner simply cites us to several of the Special Master's factual findings, all of which relate to Turner's own limited dealings with FIA. Absent evidence

regarding FIA's business relationships with other insureds, we cannot find the requisite frequency of prohibited conduct, and thus cannot find that FIA violated any portion of § 1171.5(a)(10).

■ With regard to Turner's contention that FIA's "conduct toward Turner was consistently tainted with deceptive statements about its intentions as surety in violation of UIPA § 1171.5(a)(2)", Turner points to the Special Master's findings that FIA repeatedly stated that it would "take action" on the surety contract and assume responsibility for cost overruns, but ultimately refused to do so (Findings 191, 198, 205, 225–226, 231, 477). Although these statements, in retrospect, appear to have been false and misleading, we do not believe that they are the type of statements the Pennsylvania General Assembly intended to prohibit in § 1171.5(a)(2).

The only statements that Pennsylvania courts have found to violate § 1171.5(a)(2) have been intentionally false, misleading and deceptive statements that insurance agents have made in order to attract and secure new business. *See Park v. Chronister,* 151 Pa. Cmwlth. 562, 617 A.2d 863, 869 n. 7 (1992) (agent enters into false, deceptive and misleading written agreements with insureds); *Termini v. Department of Insurance,* 149 Pa.Cmwlth. 30, 612 A.2d 1094 (1992) (agent submits insurance applications with false information); *Sullivan v. Pittsburgh, Dept. of Public Safety,* 127 Pa.Commw. 339, 561 A.2d 863 (1989) (agent misrepresents identity of insurer to potential insureds), *appeal denied,* 525 Pa. 591, 575 A.2d 120 (1990).

FIA's statements were made here in a much different context, with a much less obvious intent to deceive. FIA's representatives were not attempting to procure business by uttering misleading statements; rather, they made their statements during negotiations regarding their obligations under a valid and enforceable surety agreement, and, as we have discovered in this course of this complex litigation, those obligations were far from obvious. In light of the complexity of the situation giving rise to FIA's statements, and FIA's uncertainty regarding its responsibilities under the surety contracts as the problem unravelled, we cannot find that FIA's statements violated § 1171.5(a)(2).

■ Even though we do not believe that FIA violated the UIPA, Turner suggests that we can still find that FIA acted in bad faith under § 8371 by reference to the Special Master's findings in his "summary findings of fact". It is true that the Special Master wrote in his "summary findings of fact" that "FIA failed to timely, responsibly *and in good faith* investigate and respond to the claims of IBG's unpaid subcontractors and suppliers" (Summary Finding XI; emphasis added). He also wrote that "FIA failed to timely, responsibly *and in good faith* investigate and respond to Plaintiffs' demand for completion of IBG's work." *Id.* (emphasis added).

The detailed findings from which the Special Master derived his summary findings, however, do not describe facts that we regard as sufficient to support an affirmative finding of bad faith (*see* Findings 265–288). While we certainly do not regard FIA as an exemplar of a diligent and responsible surety, we are not convinced that "ill will" and "self interest", and not "mere negligence and bad judgment", motivated FIA's actions. *Coyne, supra,* 771 F.Supp. at 677. Under these circumstances, we will not require FIA to pay superinterest and attorney's fees pursuant to § 8371.

### (c) *Contractual Attorney's Fees*

■ Turner next argues that even if FIA is not liable for attorney's fees and superinterest under § 8371, it must still pay $322,091.75 in legal fees pursuant to two contractual provisions in the Subcontract that the parties incorporated by reference into the surety contracts.

Article XI of the Subcontract provides that IBG will be liable for

losses, damages, costs and expenses, *including legal fees and disbursements sustained,* incurred or suffered by reason of or resulting from [IBG's] default.

Subcontract ¶ XI, Exhibit P–5 to Turner's brief (emphasis added). Another provision states that the

Subcontractor and its Surety hereby agree to promptly pay all lawful claims of subcontractors, materialmen, laborers, persons, firms or corporations for labor or services performed or materials, supplies, machinery, equipment, rentals, fuels, oils, tools, appliances, insurance and other items furnished, used or consumed in connection with the prosecution of the Work provided for in said Subcontract and any and all modifications, thereof, and shall indemnify and save harmless Turner Construction Company of and from all liability loss, damage and expense, including interest, costs and *attorneys fees*, which Turner Construction Company and/or its Surety may sustain by reason of Subcontractor's failure so to do.

*Id.* ¶ U (emphasis added).

■ While we agree that these provisions entitle Turner to collect the attorney's fees it spent in achieving the project's completion, we do not believe that they entitle Turner to recover the fees it incurred as a result of the present suit. The contractual provisions, by their terms, only entitle Turner to collect attorney's fees incurred "by reason of or resulting from [IBG's] default". IBG's default, however, did not cause this lawsuit. This litigation was the product of FIA's refusal to reimburse IBG for the costs of completing the construction project and FIA's belief that it is not liable under its bonds. For this reason, we do not believe that the Subcontract, in combination with the surety contracts, requires that FIA pay Turner's attorney's fees resulting from this suit. We shall, however, require FIA to reimburse Turner for the attorney's fees Turner incurred in bringing about the completion of the atrium space frame.

### (d) *Special Master's Fees*

■ Finally, Turner requests that we order FIA to reimburse Turner for its half of the Special Master's fees. We have discretion to award this amount under Fed. R.Civ.P. 53(a), which provides in pertinent part that "[t]he compensation to be allowed to a master shall be fixed by the court and shall be charged upon such of the parties ... as the court may direct."

We cannot, however, fairly require FIA to pay Turner's half of the Special Master's fees as well as its own. When the parties agreed to our appointment of a Special Master, they understood that the costs of the process would be divided equally between them. They agreed to the appointment because they recognized that the Special Master would serve both their needs by materially advancing the resolution of this difficult case. There is no dispute that Mr. Rauch did just that.[9]

Because the Special Master's services did in fact benefit both sides, we will not require FIA to bear the full cost of his services by relieving Turner of all financial responsibility. Instead, we will exercise our discretion to maintain the *status quo* in which each party shoulders half the costs of the Special Master's services.

### *Motion for Rule 11 Sanctions*

Turner and NPCA have also filed a motion for Rule 11 sanctions against Roy Cohen, Esquire, and FIA. Plaintiffs pray that we order FIA and its counsel to reimburse them for the reasonable expenses and attorney's fees they incurred as a result of FIA's filing of motions to disqualify plaintiffs' counsel and for leave to amend defendant's answer.

### *Factual Background* [10]

On Friday, April 3, 1992, almost a year after the commencement of this litigation and eighteen months after FIA retained Roy Cohen to represent it in the atrium space frame dispute, FIA's Alongi told Cohen that Sam Warshawer, Turner's and NPCA's lead coun-

---

**9.** FIA's counsel summarized a rare point of agreement with his opponent when he said, at the second day of our hearing on the Special Master's findings, "Both Mr. Warshawer and I have expressed our gratitude to Mr. Rauch who undertook a very difficult assignment.... He has worked tirelessly to come up with a set of findings; for that we are all grateful." Tr. of April 2, 1993 hearing at 73. We join in the lawyers' high appraisal of Mr. Rauch's services.

**10.** Much of this background is based upon the voluminous record, including a hearing, that was developed in the summer of 1992 in connection with FIA's motion to disqualify plaintiffs' counsel.

sel in the instant action and an attorney at Venzie, Phillips and Warshawer ("VPW"), had contacted Patrick Lynch, the president of FIA, prior to FIA's issuance of the bonds "regarding the issuance of bonds for IBG prior to FIA's decision to issue the bonds." Cohen Affidavit of April 30, 1993, ¶ 5. Because of what Cohen claims was the "objectionable" nature of the call, Cohen decided to investigate further. *Id.* ¶ 8. Upon doing so, Cohen discovered an open case in the Court of Common Pleas of Montgomery County, Pennsylvania, *Homestead Insurance Company v. Dixon & Goode,* in which VPW represented Homestead Insurance Company ("Homestead"), one of FIA's reinsurers for which FIA acts as a servicing agent. Cohen also determined that there had been some correspondence between VPW and the general counsel for FIA regarding the *Dixon & Goode* matter as late as March 2, 1992.

Recognizing the potential ethical problems with both the *Dixon & Goode* situation and the alleged phone conversation between Lynch and Warshawer in light of VPW's representation of Turner in the instant case, Cohen consulted Professor Charles W. Wolfram, an expert on legal ethics at Cornell University. Professor Wolfram confirmed that if all the facts were as Cohen presented them, Warshawer and VPW would have been in violation of the Code of Professional Responsibility.

Eight business days after his conversation with Alongi, Cohen sent Warshawer a letter, dated April 15, 1992, in which Cohen wrote that if Warshawer and VPW did not withdraw as Turner's counsel "by the close of business on Friday, April 17, 1992", Cohen would "have no alternative but to immediately file [a] Motion to disqualify the firm of Venzie, Phillips & Warshawer." Exhibit A to the motion for sanctions. Cohen accompanied his letter with a copy of a draft motion to disqualify VPW, an affidavit Lynch had signed on April 14, and a draft motion to amend FIA's answer and affirmative defenses to include affirmative defenses of estoppel, failure to mitigate damages, and negligent misrepresentation.

Warshawer responded to each of FIA's allegations of ethical misconduct in a letter

that he faxed to Cohen on April 17, 1992. In that letter, Warshawer pointed out many factual inaccuracies in both Cohen's proposed motion and Lynch's April 14 affidavit. Among the misstatements Warshawer addressed was Cohen's characterization of the *Dixon & Goode* matter as "ongoing litigation". Warshawer informed Cohen that VPW had done nothing more for Homestead than file a writ of summons on its behalf. Moreover, VPW had sent its last invoice in the case in June of 1990, and had engaged in no activity on the case since. Warshawer further advised Cohen that the matter was "wholly unrelated" to the Turner–FIA litigation.

Much more importantly, Warshawer attached to his letter copies of correspondence between Wayne Martorelli, a lawyer at VPW, and Lynch and Alongi. In that correspondence of September, 1990, VPW had explicitly sought *and obtained* FIA's consent to represent Turner and NPCA in the atrium space frame matter. The full text of the September 18, 1990 letter from Martorelli to Lynch is as follows:

RE: Bond No.: 026353 
 Principal: Space USA, Inc., 
 d/b/a IBG International 
 Obligee: Turner Construction Company 
 Project: Atrium Space Frame and 
 Enclosure 
 Mellon Bank Center 
 18th and Market Streets 
 Philadelphia, Pennsylvania

Dear Mr. Lynch:

As you may be aware, this firm has been retained by Turner Construction Company in connection with the above-referenced matter. As you are also aware, the firm has furnished legal representation to First Indemnity of America Insurance Company ("FIA") on numerous occasions in the past.

In view of the foregoing, we have asked Paul Alongi of your office to advise us as to whether FIA has any objection to our representation of Turner in this matter. In response, Mr. Alongi has indicated that FIA has no such objection.

Therefore, this will confirm FIA's consent to our representation of Turner.

If you feel that this matter warrants further discussion, please feel free to call.

By a letter dated September 26, Alongi wrote to Martorelli stating, "Regarding your letter of September 18, 1990, be advised that FIA has no objection to your representation of Turner Construction Company in [Space USA–Turner]".

Warshawer also emphatically denied that he had ever had any conversation with Lynch in which he encouraged Lynch to issue bonds to IBG.

When Cohen consulted Lynch and Alongi about these disagreements, Lynch and Alongi assured Cohen that Warshawer was wrong. They maintained that the conversation between Lynch and Warshawer had taken place as they described, that the consent FIA had given to VPW's representation of Turner was uninformed and invalid because they had not understood that litigation could be involved, and that VPW had a continuing relationship with FIA regarding the *Dixon & Goode* matter. They stated all these views in affidavits they signed nine business days after Warshawer faxed his response.

A few days later, on May 5, 1992, a year after the filing of the complaint in this action and one month after Cohen first suspected any ethical wrongdoing, Cohen filed both a motion to disqualify plaintiffs' counsel and a motion for leave to amend FIA's answer. In support of the motions, Cohen attached the affidavits that Lynch and Alongi had signed only three business days earlier.[11]

Because the motion to disqualify raised such serious allegations of ethical misconduct, after a conference with counsel we issued an Order on May 17, 1992 directing the parties to stay all non-document discovery on the merits of the underlying case until resolution of the motion to disqualify. We then ordered the parties to spend the next month conducting discovery on the issues raised in the motion to disqualify.

Throughout the ensuing discovery, Lynch stood by his story that Warshawer had en- couraged FIA to issue the bonds to IBG. Sometime after discovery was completed but before Cohen filed his reply brief, Lynch suddenly recalled that his conversation about the bonds had not in fact been with Warshawer but with Warshawer's partner, Howard Venzie. Cohen disclosed this information for the first time in his reply brief.

We held a hearing on the motion to disqualify on August 18, 1992, and at that hearing we heard testimony from Venzie, Warshawer, Lynch and Alongi. On August 20, we issued an Order denying the motion for disqualification, and finding among other things that:

8. ... FIA's written consent of September 26, 1990, which was delivered to VP & W on October 4, 1990, was obtained after full disclosure to the highly sophisticated representatives of FIA, and in this regard the Court credits in its entirety the testimony of Howard D. Venzie, Jr., Esq., and does not credit the testimony of Paul Alongi, whose testimony in this regard was consistently evasive and unworthy of belief;

\* \* \* \* \* \*

10. There is no "appearance of impropriety" in any action VP & W has taken on Turner's and NPC's behalf to date in this litigation;

\* \* \* \* \* \*

13. Under all the circumstances, the filing of the motion to disqualify the firm of VP & W can only be regarded as a tactic to gain unfair advantage over Turner and NPC in this litigation, and as Judge Pollak put it, the ethical rules for lawyers are "not intended as an addition to the depressingly formidable array of dilatory strategies already part of the litigator's arsenal," *Caracciolo v. Ballard,* 687 F.Supp. 159, 160–161 (E.D.Pa.1988)....

Also on August 20, 1992, we ruled on FIA's motion to amend its answer and affirmative defenses. We granted that motion insofar as FIA requested leave to amend its answer to

---

**11.** Lynch's new affidavit differed from the one he had signed on April 14, 1992, in that on April 30 he swore that the date of the conversation with Warshawer was September 1989, while two weeks earlier he had sworn that the conversation had taken place in November of 1989.

assert the defense of "mitigation of damage", but to the extent that FIA requested leave to assert the defenses of "equitable estoppel" and "negligent representation", we denied it "without prejudice to FIA's renewing the motion at the close of discovery to ensure that these defenses conform to the record developed and are pled consistently with FIA's obligations under Fed.R.Civ.P. 11". Order of August 20, 1992, ¶¶ 1–2.

On October 22, 1992, Turner and NPCA filed their motion for sanctions against Cohen and FIA. Because we did not want the parties again to be distracted from the merits of the case, we issued an Order that same day directing that FIA not file a response until further order of the Court. On April 1, 1993, at the hearing on FIA's objections to the Special Master's Findings of Fact, we ordered FIA to respond to the motion.

*Legal Analysis*

■ Rule 11 provides in relevant part that:

> The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Fed.R.Civ.P. 11. Our Court of Appeals instructs that the test as to whether a pleading is "frivolous, legally unreasonable, or without factual foundation", *Lieb v. Topstone Industries, Inc.*, 788 F.2d 151, 157 (3d Cir.1986) (*quoting Zaldivar v. City of Los Angeles*, 780 F.2d 823, 831 (9th Cir.1986)), "is an objective one of reasonableness." *Id.* (*quoting Eavenson, Auchmuty & Greenwald v. Holtzman*, 775 F.2d 535, 540 (3d Cir.1985)). The Supreme Court five years later made this the uniform reading of the Rule. *Business*

*Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991).

■ Similarly, the test as to whether a pleading has been used for "an improper purpose, such as to cause harassment, undue delay, or needless increase in litigation expense" is also objective. *Lieb v. Topstone Industries, supra.* This means that a "pleader may not escape liability because he did not intend to bring about additional delay or expense." *Id.* In other words, "There is no room for a pure heart, empty head defense under Rule 11." *Id.* (*quoting* Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look*, 104 F.R.D. 181, 187 (1985)).

■ Under *Business Guides, supra*, a court may impose Rule 11 sanctions not only on the attorney who filed a motion or "other paper" but also on a party who signs any paper, such as an affidavit, filed with the court. This is because a party, like an attorney, "who signs his or her name bears a personal, nondelegable responsibility to certify the truth and reasonableness of the document." 498 U.S. at 546, 111 S.Ct. at 931. As the Supreme Court explained in *Business Guides:*

> [W]e see no reason why a District Court should be powerless to sanction the party in addition to, or instead of, the attorney. See Wright & Miller § 1336, at 104. A contrary rule would establish a safe harbor such that sanctions could not be imposed where an attorney, pressed to act quickly, reasonably relies on a client's careless misrepresentations.

498 U.S. at 548–50, 111 S.Ct. at 932–933.

After carefully canvassing the voluminous record submitted in the summer of 1992 in connection with the motion to disqualify, and spending another full day hearing extensive testimony on that motion, we conclude that FIA violated Rule 11 by submitting false information to us in connection with that motion.[12] Distasteful as it is, we are con-

---

12. We may hold FIA responsible for the misrepresentations of its agents because

> [a] corporate entity, of course, cannot itself sign anything; it can only act through its

agents. It would be anomalous to determine that an individual who is represented by counsel falls within the scope of Rule 11, but that a

strained to conclude that Cohen [13] also violated Rule 11 because even if he subjectively believed his motion to disqualify was well grounded in fact when he filed it, this belief was not objectively reasonable in light of his knowledge that his client misled him before he served the draft motion on Warshawer. Finally, we stand by the factual conclusion we reached in our Order of August 20, 1992, that Cohen and his client filed the motion to disqualify for an improper purpose; that is, they filed the motion "as a tactic to gain unfair advantage over VP & W and NPC in this litigation".

#### (a) *Lynch and Alongi, FIA's agents*

 Lynch's and Alongi's lack of candor with us was conclusively established during our hearing on the motion to disqualify.

Although Alongi signed an affidavit that was attached to FIA's motion to disqualify in which he swore that he did not understand the scope of his consent regarding VPW's representation of Turner, *see* Alongi Affidavit, Exhibit 7 to Motion to Disqualify, ¶¶ 16–34, we concluded after the hearing that FIA's consent was both informed and enforceable. Alongi is legally trained, and practiced law for over twenty years before his disbarment. "General litigation" was the mainstay of his practice. Having been intimately involved in protracted and intense meetings on the atrium space frame problems as early as September and October, 1990, at which Howard Venzie or Sam Warshawer was sitting across and adverse to him while Roy Cohen sat beside him, it is impossible to reconcile Alongi's April 30, 1992 affidavit with what he knew when he wrote his September 26, 1990 consent letter. Indeed, when this suit was filed, Alongi said he discussed VPW's representation of Turner with Cohen and Lynch, and Lynch then decided "that an objection

was not to be filed." Tr. of August 18, 1992 hearing at 156.

For these reasons,[14] we held Alongi's contrary testimony regarding this issue and others to be "consistently evasive and unworthy of belief". Order of August 20, 1990, ¶ 8. Pertinent to our inquiry under Rule 11, the cited paragraphs at the core of Alongi's affidavit could not have been "well grounded in fact" because he knew them to be false.

Similarly, Lynch swore in his affidavit, which Cohen also attached to the motion to disqualify, to the existence of "Mr. Warshawer's representation of *FIA* in the *Dixon & Goode* matter". *See* Lynch Affidavit, Exhibit 6 to Motion to Disqualify, ¶ 45 (emphasis added). We concluded after the hearing that this was a knowing misrepresentation of VPW's relationship with FIA because VPW's client in the *Dixon & Goode* matter was not FIA but Homestead Insurance Company, "a wholly independent insurance company in which FIA has no equity or beneficial interest and to which FIA, by contract, merely provides services and assumes cost-sharing responsibilities as to a narrow class of claims". Order of August 20, 1992, ¶ 2. Lynch, as president of FIA, knew this crucial distinction from the start of this litigation, and yet he intentionally concealed it from us, in violation of Rule 11, when he signed his April 30, 1992 affidavit.

At ¶¶ 22–33 and 36–37 of his affidavit, Lynch described at length "a telephone call from Mr. Warshawer" in which "Mr. Warshawer indicated that Turner would greatly appreciate it if FIA would issue IBG this bond." While these paragraphs were not a total fabrication, by the time of the hearing on August 18, 1992, they were revealed to have been completely misleading.

Notwithstanding the detail in the affidavit to suggest a lengthy telephone conversation,

---

corporate client does not because it cannot itself sign a document.
*Business Guides*, 498 U.S. at 546, 111 S.Ct. at 931.

13. Cohen, as the signer of the motion to disqualify, is alone responsible for its Rule 11 consequences. *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 125–126, 110 S.Ct. 456, 459–460, 107 L.Ed.2d 438 (1989).

14. See also n. 17, *infra.* Alongi's legal experience, and its termination, was considered at the August 18, 1992 hearing on the motion to disqualify, and testimony about these subjects appear in the transcript of that proceeding at 135–138.

it turned out that the chat could not have lasted more than two or three minutes. *See* Tr. of August 18, 1992 hearing at 60 and 77. As previously noted, the conversation was with Howard Venzie, not Sam Warshawer. Significantly, by the time of the hearing Lynch admitted that Venzie merely asked if Lynch would accept a telephone call from a representative of Turner, Joseph Strivieri, who was Purchasing Manager on the Mellon Bank Center project. At the hearing Lynch affirmed his deposition testimony, referring to what "Warshawer" had said in the conversation:

> "And that his only representation to me, he didn't ask me to write the bond, he only made me aware of Turner's needing this particular contractor and conversely on the other side for me, as I think I indicated earlier, is that we wanted to be recognized by a contractor such as Turner."

Tr. at 78–79 (quoting deposition testimony). Lynch further affirmed that Warshawer "didn't make any representations about IBG's ability to perform the work", "IBG's strength" or "any representations … about IBG's contract price." *Id.* at 79–80.

Thus, by the conclusion of the August 18, 1992 hearing, all that remained of the telephone conversation that purportedly spawned the disqualification motion was that (a) it occurred, (b) took two or three minutes, (c) said nothing about IBG's qualifications, and (d) did nothing other than lay the groundwork for FIA to do what it had wanted to do anyway, *i.e.*, achieve for FIA "a breakthrough to be able to do a bond at Turner's request." *Id.* at 60. Since this reality bears no material resemblance to the "objectionable" call Lynch described at such length in his April 30, 1992 affidavit, Lynch's affidavit was not "well grounded in fact" as he well knew when he signed it.

On this record, we find that Alongi and Lynch, acting on behalf of FIA, did not up-

hold their "personal, nondelegable responsibility to certify the truth and reasonableness" of the papers they filed with this Court. *Business Guides, supra,* 498 U.S. at 546, 111 S.Ct. at 931. Since FIA can only act through its representatives, and since Alongi and Lynch had plenary authority to act on FIA's behalf in this matter, we will impose Rule 11 sanctions on FIA.

### (b) *Cohen*

■ With regard to Cohen, he argues that we cannot sanction him for his conduct because he was simply misled by his client and Rule 11 "does not require an attorney to disbelieve his own client merely on the strength of contrary assertions by opposing counsel …", *Henderson v. Weatherly,* 116 F.R.D. 147, 148 (E.D.Pa.1987). We do not, however, require Cohen to disbelieve Lynch and Alongi merely on the strength of Warshawer's contrary assertions. Cohen himself possessed much independent evidence that belied his client's statements and which should have prevented him from taking the drastic step he took when he filed the motion he signed.

The most notable of this evidence was the fact that during Cohen's "intensive factual and legal investigation" and preparation of his motions, Cohen Affidavit ¶ 28, Lynch and Alongi did not once mention the fact that they had already consented to VPW's representation of Turner.[15] When Warshawer disclosed to Cohen that FIA had given such consent—and, indeed, shared the actual letters memorializing that consent—Cohen should have realized that Lynch and Alongi had not been at all candid with him. At this point, an attorney conducting a "reasonable inquiry" would have put the motion to disqualify on hold and engaged in an intense round of investigation. Cohen, however, waited only a few business days before filing his motion. Moreover, he did not lose faith

---

15. Cohen says in his affidavit that he spent "approximately 200 hours" investigating the basis for his motions before he filed them. Cohen Affidavit ¶ 28. Recalling that Cohen was not alerted until April 3, 1992 that there may have been an ethical violation, and that he served a draft motion with Warshawer on April 15 and that he filed his motion with the Court on May 5,

1993, we assume that by April 17, 1993, Cohen had been investigating for close to 100 hours. It is inexcusable that, in all of this time, Lynch and Alongi never disclosed that FIA had given its consent to VPW. It is also inexcusable that Cohen apparently did not ask if there was any correspondence on this subject.

in Lynch and Alongi, and unquestioningly accepted their feeble explanation that, in spite of what Cohen knew was their business and legal expertise, the consent they had given was uninformed because Turner had not advised them of the scope of the consent.[16]

In this last respect, Cohen seeks safe harbor in the paragraphs of Lynch's and Alongi's April 30, 1992 affidavits to the effect that they would never have consented "[i]f the possibility of litigation ... were discussed" in September of 1990. Alongi affidavit ¶ 32; Lynch affidavit ¶ 70. For Cohen to accept these statements was to blind himself to the fact that they were made after the passage of eleven months of vigorous litigation in the very suit in which they were filed. Cohen was himself asked what to do about VPW after this suit was filed, and knew Lynch decided to raise no objection. *See* n. 16. Since Cohen himself sat across from VPW lawyers in a highly adversarial setting beginning in early October, 1990, with Paul Alongi beside him on many occasions, Cohen could recognize without Warshawer's assistance that Alongi's and Lynch's "scope of consent" statements were palpable falsehoods.[17]

Cohen was further put on notice of Lynch's and Alongi's lack of concern for the truth when Lynch backpeddled about his allegations regarding his conversation with Warshawer about the issuance of the bonds. First, after Lynch had already signed an affidavit on April 14, 1992 stating that the alleged conversation took place in November of 1989, he signed a second affidavit two weeks later stating that the conversation had in fact taken place two months earlier. Then, before Cohen signed his reply brief on the motion to disqualify, Lynch's memory continued to improve with time as he recalled that the notorious conversation that he had twice sworn took place with Warshawer had actually taken place with Howard Venzie. In the face of these repeated shifts in Lynch's story, Cohen chose to press on with the motion rather than take the responsible step of withdrawing it.

In this context, a lawyer cannot satisfy his duty of "reasonable inquiry" by blinding himself to the untenability of statements clients ask him to act upon. Cohen was not the straw man he proffers to us who is asked to believe opposing counsel and not his client. Based on what Cohen himself saw in the September, 1990 consent correspondence, and based on the intensity of negotiation and litigation in which he himself participated for FIA since early October of 1990 against VPW lawyers, it was not objectively reasonable for him to accept Alongi's and Lynch's statements as "well grounded in fact."

This conclusion seems to us doubly secure when it is recalled that the "motion" and "other papers" raised such a grave issue. On such an issue, "reasonable inquiry" surely requires more than a lawyer's uncritical blindness to the incredibility of his client's statements. There was no rush to raise this issue after so long a passage of time, and Cohen saw many flashing red lights that

---

16. Cohen's stated reliance on Alongi's and Lynch's explanation is disingenuous given that Cohen knew Alongi to be not only a sophisticated businessman, but also a lawyer who practiced "general litigation" law for twenty-two years before his disbarment in 1987 for misappropriating client trust funds. *See* Transcript of the hearing on the motion to disqualify at 135–138. Cohen also neglects to mention that when this suit was filed, Alongi specifically asked Cohen what to do about VPW, and Lynch ultimately decided "that an objection was not to be filed." *Id.* at 156.

17. As early as a meeting on September 17, 1990, Howard Venzie reported that he said, with Paul Alongi present, "I'm very comfortable ... that I used the word 'sue' and I used it with the intent that I was going to sue anybody and everybody, if this was going to cause Turner a problem." Tr.

of August 18, 1992 hearing on the motion to disqualify at 194. Indeed, we completely credited Venzie's testimony, concerning the same meeting, that *he* told Alongi, "I strongly recommend that you get other, outside counsel involved ... because it's obvious to me that we're going to end up having to become involved in suits over this." *Id.* at 195. Since by October 4 Cohen was participating in these meetings, it is inconceivable to us that Alongi, having taken Venzie's advice to retain outside counsel, *see* disqualification hearing Transcript at 151, did not convey the substance of Venzie's prediction "that we're going to end up having to become involved in suits over" the space frame fiasco. In any event, if Cohen was able to imagine that this was a pacific engagement when he was retained, such a delusion could not have survived the first meeting he attended on October 4, 1990.

would have stopped a responsible advocate from filing so significant a motion.

### (c) *"Improper purpose"*

We recognize that once Cohen fired his gun on April 15, 1992, retreat was difficult for tactical reasons. Cohen gave Warshawer a forty-eight hour fuse to withdraw as counsel. Such an outrageous deadline could only have been to gain tactical—read, "settlement"—advantage. To back down on the disqualification motion after Warshawer produced the September, 1990 consent correspondence would doubtless have undermined FIA's bargaining position. It would, however, have prevented the filing of an unwarranted motion that publicly called into question a lawyer's most important asset, his ethical reputation.

The Supreme Court has made a signer's duty "personal" and "nondelegable" precisely to assure that the public machinery of the federal courts does not begin to work "for any improper purpose such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." By serving his draft motion with a forty-eight hour trigger, Cohen manifestly used the threat of the disqualification motion to raise the stakes of the game for Turner. By carrying out that threat in the face of Warshawer's disclosures, Cohen subjected himself to the sanctions the Rule authorizes. Under all these circumstances, we believe it appropriate to sanction Cohen as well as FIA for filing and defending the motion to disqualify.

### (d) *Motion to amend*

■ We will not, however, sanction either Cohen or FIA for filing and defending the motion to amend FIA's answer and affirmative defenses. Although that motion was somewhat related to the motion to disqualify, it also had its own individual merit and was not frivolous or unfounded.[18] In light of the partial merit of FIA's motion to amend, we do not believe that FIA acted in violation of Rule 11 when it filed that motion.

The sanction we will impose will therefore be the attorney's fees and costs Turner and NPCA incurred solely in connection with their defense of the motion to disqualify.

### (e) *Apportionment of sanction*

■ It seems likely that, even excluding the time associated with the motion to amend, the net sanction will reach into six figures. We do not believe Cohen's responsibility for a sanction of such magnitude should be joint and several with FIA's. While Cohen in our view should not have filed the motion to disqualify, the record is clear to us that he was doing his client's bidding. Lynch and Alongi initially withheld from Cohen the September, 1990 consent correspondence. Lynch misled Cohen about FIA's independence from Homestead Insurance Company and the truth about his brief and inconsequential telephone ·conversation with Howard Venzie. When these supports crashed around him, Cohen was faced with a lawyer's nightmare, a conflict between loyalty to his client and his duty to the Court.[19]

There are times, however, when a lawyer's duty to the Court must eclipse his loyalty to his client. This case presented such an occasion in May of 1992. By imposing responsibility on Cohen, perhaps other lawyers, faced with the dilemma he did, will have an easier time explaining to their clients why they elect to affirm their duty to the integrity of this Court's processes.

In any event, because we have concluded that FIA was significantly more at fault in this debacle than Cohen, FIA will bear eighty percent of the sanction and Cohen will be responsible for twenty percent. We shall enter an appropriate Order after plaintiffs submit affidavits documenting the attorney's fees and costs to which we have held them to be entitled.

### ORDER AND JUDGMENT

AND NOW, this 1st day of June, 1993, upon consideration of the motions pending in this case, it is hereby ORDERED that:

---

18. As we noted above, we granted that motion in part and denied it in part.

19. We leave aside, as beyond our jurisdiction, Cohen's moral duty to Warshawer.

1. Plaintiffs' motion for adoption of the Special Master's Report, Conclusions of Law and Entry of Judgment is GRANTED;

2. FIA's motion for rejection or, in the alternative, modification of the Special Master's findings of fact is DENIED;

3. FIA's motion for adoption of its proposed conclusions of law is DENIED;

4. Turner and NPCA's motion for Rule 11 sanctions is GRANTED;

5. JUDGMENT IS ENTERED in favor of Turner Construction Company and Nine Penn Center Associates, L.P. and against defendant First Indemnity of America Insurance Company in the amount of One Million One Hundred Sixty–Six Thousand One Hundred Nineteen Dollars and Thirty–Four Cents ($1,166,119.34) plus interest from the date of entry of this judgment calculated in accordance with 28 U.S.C. § 1961;

6. Turner and NPCA shall by June 8, 1993 submit affidavits of their attorney's fees and costs incurred in connection with the completion of atrium space frame construction, that is, from September, 1990 through June, 1991 excluding legal time and expenses associated with this suit; and

7. Turner and NPCA shall by June 8, 1993 submit affidavits of their attorney's fees and costs incurred in 1992 solely in connection with their defense of FIA's motion to disqualify and excluding legal time and expenses they incurred in responding to FIA's motion to amend.